**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 19-CR-1004-CJW |
| vs. | |
| | **REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE, MOTION TO QUASH SEARCH WARRANTS AND SUPPRESS EVIDENCE, SUPPLEMENTAL MOTION TO SUPPRESS, AND MOTION TO DISMISS** |
| BRANDON JAMES SEYS, | |
| Defendant. | |

_____

## TABLE OF CONTENTS

Page

I.     **INTRODUCTION**............................................................................ 3

II.    **FINDINGS OF FACT** ................................................................... 4

      *A.*    *Search Conducted Via GPS Mobile Tracking Devices Affixed to Two Vehicles Beginning December 5 and 6, 2018* ................................. 4

      *B.*    *December 30, 2018 Search of the Storage Unit at Alt's Mini Storage in Dubuque, Iowa*.................................................................... 8

      *C.*    *December 30, 2018 Search of the Silver Cadillac* ............................ 9

      *D.*    *December 30, 2018 Search of Room 242 in the Hilton Garden Inn, Dubuque, Iowa*...................................................................10

      *E.*    *December 30, 2018 Search of 740 Boyer Street* .............................14

III.   ANALYSIS ..................................................................................14

    A.   *Defendant's Motion to Quash Search Warrants and Suppress
        Evidence* ..........................................................................14

        1.   *Standard of Review for Determining Whether Probable Cause
            Existed to Issue the Warrants Authorizing Placement of the GPS
            Mobile Tracking Devices* ..............................................15

        2.   *Defendant was not entitled to a Franks hearing on this issue* ....16

        3.   *Substantial evidence in the record supports the decision to issue
            the warrant for the GPS tracking devices* ............................18

        4.   *Even if the warrant was not supported by probable cause, the
            Leon good faith exception applies to the warrant* ...................28

        5.   *Recommendation on Warrant for GPS mobile tracking units* ....33

    B.   *The Warrant for 740 Boyer Street, Defendant's Person, the Silver Van,
        the Silver Cadillac, and Unit 388* ..............................................33

        1.   *The Warrant as Written* ................................................33

        2.   *Even if the warrant was not supported by probable cause, the
            Leon good faith exception applies to the warrant* ...................34

        3.   *The warrant is still supported by substantial evidence, even if
            allegedly tainted information is redacted* ............................36

        4.   *Conclusion* ..............................................................40

    C.   *Defendant's Motion to Suppress Hotel Room Search and Supplemental
        Motion to Suppress* ..............................................................40

        1.   *Defendant has not established a violation of his rights under
            Franks v. Delaware* ....................................................42

2

    2.  *Substantial evidence in the record supports issuance of the warrant to search room 242* .................................................**43**

    3.  *Even if the warrant was not supported by probable cause, the Leon good faith exception applies to the warrant* ..................**46**

    4.  *The warrant is still supported by substantial evidence, even if allegedly tainted information is redacted* ............................**47**

    5.  *Conclusion* ................................................................**50**

  D.  *Defendant's Motion to Dismiss should be denied* ...........................**50**

    1.  *Relevant Facts* ...........................................................**50**

    2.  *Analysis* ...................................................................**51**

**IV.**  **CONCLUSION** .............................................................**55**

## I.  INTRODUCTION

The matters now before me are Defendant's Motion to Quash Search Warrants and Suppress Evidence (Doc. 18); Defendant's Motion to Suppress Hotel Room Search (Doc. 20); Defendant's Supplemental Motion to Suppress (Doc. 62); and Defendant's Motion to Dismiss (Doc. 34). On January 24, 2019, the Grand Jury indicted Defendant with Conspiracy to Distribute Methamphetamine, Possession of Firearms During and in Relation to a Drug Trafficking Crime, Possession of Firearms by a Felon, Possession with Intent to Distribute Methamphetamine, and Possession with Intent to Distribute Cocaine. (Doc. 2.)

The Honorable Charles J. Williams, United States District Court Judge, referred these motions to me for a Report and Recommendation. On June 5, 2019, I held an evidentiary hearing on Defendant's Motion to Quash Search Warrants and Suppress Evidence and Defendant's Motion to Suppress Search of Hotel Room. This hearing was

continued on August 28, 2019.  On August 23, 2019, Defendant filed his Supplemental Motion to Suppress.  The parties agreed that hearing testimony received at the June 5 hearing was relevant to all motions.  On August 28, 2019, I held the continued evidentiary hearing on the motions.  The Government did not call any witnesses at either hearing. Defendant called the following witnesses:

- Dubuque, Iowa Drug Task Force Officer Daniel Kearney; and

- Dubuque, Iowa Police Officer Nicholas Schlosser.

For the following reasons, I respectfully recommend that the District Court deny all Defendant's motions.

## II.    FINDINGS OF FACT

This case involves an alleged conspiracy to distribute methamphetamine and cocaine in the Northern District of Iowa.  The investigation into this alleged conspiracy included law enforcement use of GPS tracking devices on two vehicles and a surveillance camera to monitor a Dubuque, Iowa residence. In addition to this surveillance activity, the investigation also included searches of Defendant's person, Defendant's hotel room, one of the vehicles that was subject to tracking, a storage unit, and a residence that was subject to surveillance.  All searches were conducted pursuant to warrants issued by Iowa state court judges.  Defendant seeks to suppress all physical evidence seized during these searches, and seeks dismissal of the case.  (Docs. 18, 20, 34, 62.)

A.    *Search Conducted Via GPS Mobile Tracking Devices Affixed to Two Vehicles Beginning December 5 and 6, 2018*

Law enforcement first learned of Defendant's alleged involvement in a drug trafficking conspiracy between late 2017 and early 2018.  (Gov. Ex. 1 at 3-4 ¶ 4.)  In April 2018, Investigator Chad Leitzen of the Dubuque Drug Task Force ("DDTF") met with M.S., one of Defendant's alleged customers.  (*Id.* at 4 ¶ 9.)  M.S. told Investigator Leitzen that Defendant is a large methamphetamine dealer in Dubuque.  (*Id.* at 3-4 ¶ 4.)

M.S. further told Investigator Leitzen that Defendant regularly makes trips to Kansas City to pick up large amounts of methamphetamine, then sells that methamphetamine in Dubuque. (*Id.* at 4 ¶ 5.) M.S. stated that K.R.S. is M.S.'s ex-girlfriend, and K.R.S. began dating Defendant after M.S. and K.R.S. ended their relationship. (*Id.* at 4 ¶ 6.) M.S. stated that he had K.R.S.'s phone in his possession, and K.R.S.'s Google Maps history showed she had taken a trip to Kansas City. (*Id.* at 4 ¶ 7.) Shortly after meeting M.S., Investigator Leitzen met K.R.S. at the Dubuque County Jail. K.R.S. told Investigator Leitzen that she once accompanied Defendant to Kansas City. (Kearney June 5, 2019 Hr'g Test; Gov. Ex. 1 at 4 ¶ 8.) K.R.S. told Investigator Leitzen she believed she was going to visit Defendant's family in Kansas City, but the pair instead met a methamphetamine supplier in a hotel. (Gov. Ex. 1 at 4 ¶ 8.) K.R.S. further stated she returned with Defendant to Dubuque so Defendant could sell the methamphetamine. (*Id.* at 4 ¶ 8.)

On May 26, 2018, the Muscatine County Sheriff's Office investigated a motor vehicle accident in the city of Muscatine, Iowa. (*Id.* at 4 ¶ 10.) The debris from the accident included two backpacks holding a total of 8.5 ounces of methamphetamine. (*Id.*) Defendant's name was present on items found in the backpacks.[1] (*Id.*; Def. Ex. G.)

On October 10, 2018, Deputy Daniel Kearney met with Dubuque County Jail inmate C.M. (Gov. Ex. 1 at 5 ¶ 17.) C.M. told Deputy Kearney that Defendant regularly brings five to ten kilograms of methamphetamine into the Dubuque area, but C.M. did not provide any specific dates regarding when Defendant allegedly brought the

---

[1] The evidence regarding Defendant's name in a backpack that contained drugs is referred to in the affidavit in support of the application for the GPS warrant. (Gov. Ex. 1 at 4 ¶ 10.) This is something of an unhelpful loose end because the backpack and drugs were never tied to Defendant. I do not consider this evidence supportive of probable cause. Also, if redacted, this information would not undermine the substantial evidence of probable cause in my analysis below. I do not factor it into my analysis and recommend the District Court disregard it.

methamphetamine to Dubuque. (*Id.*; Kearney June Hr'g Test.) In a second meeting with Deputy Kearney on November 6, 2018, C.M. stated that Defendant was residing at K.H.'s Dubuque residence and that the residence is Defendant's safehouse. (Gov. Ex. 1 at 6 ¶ 26; Gov. Ex. 3 at 12 ¶ 15.) Law enforcement believed K.H. resided at 740 Boyer Street. (Gov. Ex. 1 at 6 ¶¶ 25-26.)

On October 16, 2018, Investigator Leitzen spoke with D.G.F. while D.G.F. was in custody for possession of ice methamphetamine. (*Id.* at 4 ¶ 11.) D.G.F. told Investigator Leitzen that Defendant was the largest methamphetamine dealer in Dubuque. (*Id.* at 5 ¶ 12.) D.G.F. repeated M.S.'s claim that Defendant picks up methamphetamine every week or two from a supplier in Kansas City, and returns to Dubuque to sell the methamphetamine. (*Id.* at 5 ¶ 15.) D.G.F. further stated that Defendant drove a silver minivan or silver car, and that Defendant texted D.G.F. coded drug messages. (*Id.* at 5 ¶¶ 12, 14.) D.G.F. has a criminal history, but, as was true of all individuals law enforcement interviewed, the affidavit did not include information about D.G.F.'s motivation for providing information or a promise of leniency. At the hearing, Deputy Kearney testified no such promises were made. (Kearney June Hr'g Test.)

Investigator Leitzen's October 16 conversation with D.G.F. also sparked law interest in the vehicles law enforcement would eventually track because D.G.F. stated Defendant drove a silver car or silver minivan. (Gov. Ex. 1 at 5 ¶ 12.)

On October 26, 2018, investigators observed a silver Cadillac with license plate HLE 743 ("the silver Cadillac") parked at 740 Boyer Street, where law enforcement believed Defendant resided with K.H. (*Id.* at 5 ¶ 19.) The silver Cadillac was registered to James Alan Kringle of Dubuque, Iowa. (*Id.*) In addition to the silver Cadillac, investigators also observed a silver Chrysler Town and Country minivan with Iowa license plate GZL 536 ("the silver van") and a silver Chevrolet Monte Carlo ("the silver Chevrolet") parked at 740 Boyer Street. (*Id.*) Both the silver van and the silver Chevrolet

were registered to Defendant. (*Id.*) Investigators observed the silver Cadillac and the silver van parked at 740 Boyer Street on multiple other occasions. (*Id.*)

On October 29, 2018, Deputy Kearney met with Confidential Informant ("C.I.") #12117. (*Id.* at 5 ¶ 18.) C.I. #12117 stated K.H.'s methamphetamine supplier drove a silver van and further identified Defendant in a photo lineup as K.H.'s methamphetamine supplier. (*Id.*)

On October 30, 2018, DDTF investigators observed Defendant leave the Q Casino in Dubuque in the silver Cadillac. (*Id.* at 6 ¶ 25; Kearney June Hr'g Test.) The silver Cadillac was then driven to 740 Boyer Street. (Gov. Ex. 1 at 6 ¶ 25; Kearney June Hr'g Test.) The record does not identify who drove the silver Cadillac.

On November 19, 2018, investigators met with Dubuque County Jail inmate R.H. (Gov. Ex. 1 at 7 ¶ 27.) R.H. identified Defendant as the main methamphetamine supplier in Dubuque. (*Id.*) R.H. further stated that Defendant drove a light-colored Cadillac and a silver van. (*Id.*)

On November 30, 2018, the DDTF began conducting twenty-four-hour video surveillance on 740 Boyer Street using a Milestone surveillance camera. (Kearney Aug. 28, 2019 Hr'g Test.) This Milestone camera remained in place until mid-January 2019. (Kearney Aug. Hr'g Test.) During the course of this surveillance, Deputy Kearney printed approximately six or seven screenshots of relevant surveillance footage. (Kearney Aug. Hr'g Test.)

On November 30, 2018, Deputy Kearney applied for a GPS mobile tracking device search warrant for the silver Cadillac and the silver van. (Gov. Ex. 1 at 1-2.) Deputy Kearney signed an affidavit in support of the application. (*Id.* at 8.) November 30, 2018, the application was subscribed and sworn to a judge, who issued the warrant. (*Id.* at 2, 9.)

7

On December 5, 2018, the DDTF, with the Bettendorf Police Department's assistance, placed a GPS mobile tracking device on the silver Cadillac. (Gov. Ex. 3 at 13 ¶ 18.) On December 6, 2018, the DDTF placed a GPS tracking unit on the silver van. (*Id.*)

**B.     December 30, 2018 Search of the Storage Unit at Alt's Mini Storage in Dubuque, Iowa**

Although the record does not provide exact dates, investigators observed Defendant frequently visit Alt's Mini Storage unit 388 ("unit 388") prior to December 30, 2018. (Def. Ex. K at 3; Gov. Ex. 2 at 7 ¶ 18.) Additionally, the GPS unit discussed above showed the silver van visited unit 388. (Def. Ex. K at 3; Gov. Ex. 2 at 7 ¶ 18.)

On November 16, 2018, the DDTF conducted open-air dog sniffs at Alt's Mini Storage. (Gov. Ex. 2 at 7 ¶ 18.) Deputy Kearney's canine partner Odim indicated on unit 388. (*Id.*) Unit 388 was registered to K.H., to whom law enforcement believed Defendant was supplying methamphetamine. (Gov. Ex. 1 at 5 ¶ 18; Gov. Ex. 2 at 7 ¶ 18.) The Dubuque County Sheriff's K-9 Unit subsequently performed two additional open-air sniffs, with canines indicating on unit 388 each time. (Gov. Ex. 2 at 8 ¶ 19.)

Deputy Dan Kearney has been employed as a Dubuque County Sheriff's Deputy since May 2003. (Gov. Ex. 1 at 3 ¶ 1.) He became a canine handler in 2009 (*Id.*) and was promoted to drug task force investigator in 2017. (Kearney August Hr'g Test.) Deputy Kearney has worked with Odim since 2014. (*Id.*) Odim is Deputy Kearney's second dog as a canine handler. (*Id.*)

On December 30, 2018, Investigators Leitzen and Schlosser executed a search warrant on unit 388. (Def. Ex. K. at 3.) Investigator Nick Schlosser applied for the search warrant on December 28, 2018. (Gov. Ex. 3 at 3.) Judge Scott Engleman signed the application on December 28, 2018 and issued the search warrant. (*Id.* at 3, 25.) The search of the storage unit yielded two handguns and ammunition. (Def. Ex. K at 4.)

8

*C.*      *December 30, 2018 Search of the Silver Cadillac*

October 13, 2018 surveillance footage from Rhythm City Casino showed Defendant enter the casino with E.D. and an unidentified white man. (Gov. Ex. 3 at 10-11 ¶ 13.) The video later shows the unidentified man place cash near the slot machine where E.D. was seated. (*Id.*) E.D. then removed a bag with a white substance from her purse and handed it to the man. The surveillance footage then shows Defendant, E.D., and the man in a silver Cadillac with a temporary rear plate. (*Id.*) The surveillance footage then shows Defendant driving the Cadillac away from the casino. (*Id.*)

As discussed above, the DDTF obtained a warrant on November 30, 2018, authorizing law enforcement to track the silver Cadillac using a GPS mobile unit. (*Id.* at 13 ¶ 18.) This tracking unit allowed law enforcement to follow the vehicle's movement. The vehicle traveled routes law enforcement believed to be consistent with an individual conducting countersurveillance. (*Id.* at 16 ¶ 22.) The DDTF also observed Defendant traveling to and from 740 Boyer Street in the silver Cadillac, and observed Defendant removing duffel bags from the silver Cadillac while the car was parked at 740 Boyer Street. (*Id.* at 13-14 ¶¶ 19–20.)

On December 28, 2018, Officer Nicholas G. Schlosser of the Dubuque Police Department applied for a search warrant authorizing a search of the silver Cadillac. (*Id.* at 4.) The affidavit accompanying the December 28 search warrant application states that Officer Schlosser currently works in the Dubuque Police Department's Criminal Investigations Division. (*Id.* at 4 ¶ 1.) Additionally, Officer Schlosser is a Task Force Officer for the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (*Id.*)

Officer Schlosser's affidavit supporting the December 28 application was partly based on surveillance law enforcement conducted at the Q Casino in Dubuque. DDTF investigators observed the silver Cadillac parked at the Q Casino, observed Defendant in

the casino, and observed Defendant leave the casino in the silver Cadillac. (*Id.* at 11-12 ¶ 14.)

Pursuant to the same warrant authorizing the search of unit 388, the DDTF conducted a search of the silver Cadillac while it was parked outside the Hilton Garden Inn in Dubuque, Iowa on December 30, 2018. (Def. Ex. K at 3.) The search yielded Ziploc bags, gem baggies, a bag of rubber bands, glass methamphetamine smoking pipes, and a pill bottle containing an off-white crystal substance. (*Id.*) This off-white crystal substance field-tested positive for methamphetamine. (*Id.*)

**D.** ***December 30, 2018 Search of Room 242 in the Hilton Garden Inn, Dubuque, Iowa***

On December 30, 2018, the DDTF conducted a search of room 242 at the Hilton Garden Inn in Dubuque, Iowa. (Doc. 25-1 at 6.) The search warrant was based, in part, on an open-air sniff Dubuque Police Officer Mathew Sitzman and his canine partner Mali conducted in the hallway outside room 242 at approximately 12:41 a.m. (Gov. Ex. 2 at 11 ¶ 40.) Inside room 242, Investigators found a white substance that field tested positive for cocaine, a small gem bag with ice methamphetamine, glass smoking pipes, assorted unidentified pills, cell phones, laptops, stealth cameras, a trail camera, notebooks containing possible drug ledgers, and a pill bottle with an unidentified brown crystal substance. (Def. Ex. K at 4.)

While many circumstances led to the search of room 242, a crucial factor was Mali's indication on room 242. (Gov. Ex. 2 at 11 ¶ 40; Def. Ex. K at 3.) Defense counsel and the Government stipulated that Mali was properly certified and participated in continual training. (Sitzman June 5, 2019 Hr'g Test.)

In addition to the open-air sniff and information from sources discussed above, the warrant application for room 242 was based in part on information from the GPS trackers

10

on the silver Cadillac and the silver van.[2] (Gov. Ex. 2 at 8, 9-10 ¶¶ 22-23, 31-33.) The application was also based on the video surveillance of 740 Boyer Street. (*Id.* at 8-10 ¶¶ 24-25, 29, 34.) Video footage of that surveillance is not available because it was not saved on any servers. (Kearney August Hr'g Test.) The warrant application was also based on the open-air sniffs of unit 388.[3] (Gov. Ex. 2 at 7 ¶ 18.)

At approximately 6:30 p.m. on December 29, 2018, Deputy Kearney set up surveillance at the Hilton Garden Inn in Dubuque, Iowa, a place Defendant was known to frequent. (Def. Ex. K at 1.) Deputy Kearney simultaneously surveilled 740 Boyer Street via a video feed from the Milestone camera.[4] Using this video feed, Deputy Kearney observed E.D., Defendant, and an unknown woman enter the silver Cadillac. (*Id.* at 1-2.) Law enforcement was no longer able to track the silver Cadillac with a GPS unit because someone had removed the unit on December 23, 2018. (*Id.* at 1.) Investigator Williams, an investigator with the DDTF, joined Deputy Kearney at the Hilton Garden Inn at approximately 9:30 p.m. (*Id.* at 1.) At approximately 10:15 p.m., Investigator Williams and Deputy Kearney observed what they believed to be the silver Cadillac arrive at the Hilton Garden Inn. (*Id.* at 2.) Shortly after 10:15 p.m., Investigator Nick Schlosser found the silver Cadillac parked near the rear hotel parking lot, but the vehicle was unoccupied. (*Id.*)

After identifying the silver Cadillac parked near the rear hotel parking lot, Investigator Schlosser went into the casino's surveillance room to locate Defendant. (*Id.*) Investigator Schlosser reviewed casino surveillance footage, which showed E.D. and Defendant enter the rear hotel entrance. (*Id.*) Investigator Schlosser also saw E.D. and

_____

[2] *See supra* Section II.A. (discussing the application to place GPS trackers on the silver Cadillac and the silver van).

[3] *See supra* Section II.B. (discussing the search of storage unit 388 at Alt's Mini Storage).

[4] *See supra* Section II.A. (discussing the placement of a Milestone camera placed to surveil 740 Boyer Street).

11

Defendant enter room 242. (*Id*. at 2-3.) At approximately 12:10 a.m. on December 30, E.D. exited room 242 to smoke a cigarette with the hotel desk clerk. (*Id*. at 3.) Deputy Kearney detained E.D. and led her into a private conference room. (*Id*.) E.D. consented to searches of her person and her purse that did not yield any illegal contraband. (*Id*.)

At approximately 12:13 a.m. on December 30, Special Agent Joshua Mulnix of the Division of Narcotics Enforcement (Gov. Ex. 2 at 6 ¶ 12), Investigator Leitzen, and Sergeant Gary Pape of the DDTF detained Defendant at the bottom of a staircase between room 242 and an exit from the hotel. (Def. Ex. K at 3; Kearney Aug. Hr'g Test.) Defendant was moved to a room separate from E.D. (Def. Ex. K at 3.) Defendant had $10,000 in his possession when he was detained. (*Id*.)

At approximately the same time Special Agent Mulnix, Investigator Leitzen, and Sergeant Pape detained Defendant and E.D., Mali performed the open-air dog sniff of the hallway outside of room 242 with Deputy Sitzman. (*Id*.) Deputy Sitzman has been a deputy since 2007, and has been a canine handler since 2015. (Sitzman Hr'g Test.)

Deputy Sitzman and Mali conducted an open-air sniff on several doors in the hallway outside room 242. (Def. Ex. A.) The open-air sniff begins as Mali, on a leash, enters opposite the camera. (*Id*. at 0:10.) Deputy Sitzman begins by making small circles with Mali near the end of the hallway. (*Id*. at 0:15.) Deputy Sitzman and Mali move down the hallway past the doors, commencing with those on the right side of the hallway (from the viewer's perspective) and moving to the doors on the left. (*Id*. at 0:20.) Mali passes the doors quickly. Then Deputy Sitzman points toward the bottom of the doors, apparently seeking a closer inspection. (*Id*. at 0:20.) When Mali returns to a door, he spends a few seconds with his nose near the floor, and then moves on to other doors. (*Id*. at 0:20.)

Mali, still leashed, shows heightened interest for the first time when he passes by room 242, on the left side of the hall. (*Id*. at 1:00.) Deputy Sitzman seems to point at

the bottom of the door several times, but a wall obstructs the view of his arm and head, so it is difficult to see exactly where he is pointing. (*Id.* at 1:00.) Mali then lies on his stomach in front of room 242. (*Id.* at 1:11.) Deputy Sitzman then tugs on the leash, pulling towards the camera. (*Id.* at 1:13.) Mali remains down. (*Id.* at 1:13.) Deputy Sitzman then tugs again on the leash, this time in the opposite direction. (*Id.* at 1:17.) Mali remains down. (*Id.* at 1:17.) Deputy Sitzman then drops the leash and walks toward the camera. (*Id.* at 1:18.) Mali remains down in front of room 242. (*Id.* at 1:18.) Deputy Sitzman stops, turns, and faces Mali, who remains down. Deputy Sitzman does not appear to say anything to Mali. (*Id.* at 1:25.) Deputy Sitzman then starts to walk back towards Mali, who remains down in front of room 242. (*Id.* at 1:31.)

As Deputy Sitzman walks past Mali, Mali remains down in front of room 242 and Deputy Sitzman tosses a ball behind his back, bouncing it against the door or the wall. (*Id.* at 1:35.) Mali chases the ball, grabs it in his mouth, and runs to Deputy Sitzman, who is now standing in approximately the middle of the hallway. (*Id.* at 1:39.) Mali turns and runs to the other officers. (*Id.* at 1:40.) Mali runs past a utility room on the right side of the screen to get to the other officers and appears momentarily distracted there. (*Id.* at 1:42.)

Deputy Sitzman walks towards the other officers and Mali. (*Id.* at 1:45.) When Deputy Sitzman reaches Mali, he pets Mali directly outside of the utility room. (*Id.* at 1:45.) Deputy Sitzman then appears to send Mali in the direction of the camera such that he momentarily disappears. (*Id.* at 1:50.) When Mali returns, Deputy Sitzman gives him a "down" command in the hallway outside of the utility room. (*Id.* at 1:55.) Deputy Sitzman leads Mali out of view. (*Id.* at 2:05.)

When Mali returns, he runs to the utility room and sniffs the bottom of the door. (*Id.* at 2:53.) Mali briefly turns towards Deputy Sitzman, but as Deputy Sitzman walks past Mali towards the opposite end of the hallway, Mali does not follow him. (*Id.* at

13

2:55-2:58.)  Instead, Mali turns back toward the utility room and smells the bottom of the door again.  (*Id.* at 2:58.)  Mali then lies down on his stomach in front of the utility room.  (*Id.* at 3:02.)  Officers appear to be conversing near Mali, but Mali remains down.  (*Id.* at 3:02.)  Deputy Sitzman, standing a few feet from Mali, tosses a ball at him.  (*Id.* at 3:06.)  Mali chases the ball, and returns to Deputy Sitzman and is petted.  (*Id.* at 3:08.)

Mali alerts to the presence of narcotics by lying down.  (Sitzman Hr'g Test.)  Deputy Sitzman rewards Mali for alerting to narcotics in several ways, one of which is throwing a ball for Mali.  (*Id.*)

### E.    *December 30, 2018 Search of 740 Boyer Street*

On December 30, 2018, the DDTF executed a search warrant on 740 Boyer Street.  (Def. Ex. K at 4-5.)  This search was conducted pursuant to the same search warrant authorizing the searches of unit 388 discussed in Section II.B. and the silver Cadillac discussed in Section II.C.  (Gov. Ex. 3 at 1.)

Investigator Leitzen and Deputy Kearney left the Hilton Garden Inn at 4:35 a.m. to assist investigators conducting the search of 740 Boyer Street.  (Def. Ex. K at 4.)  Other DDTF investigators were already searching the residence's basement when Investigator Leitzen and Deputy Kearney arrived.  (*Id.* at 5.)  It is unclear what time investigators began searching the residence.  Law enforcement focused the search on the basement because this is the area where law enforcement believed Defendant resided.  (*Id.*)  The search of 740 Boyer Street concluded at 6:30 a.m. on December 30, 2018 and yielded packaging material, digital scales, surveillance cameras, cell phones, and the GPS tracking unit law enforcement had installed on the silver Cadillac.  (*Id.*)

### III.    ANALYSIS

### A.    *Defendant's Motion to Quash Search Warrants and Suppress Evidence*

Defendant argues that the affidavits accompanying Deputy Kearney's applications for search warrants authorizing law enforcement to place GPS tracking devices on the

14

silver Cadillac and the silver van "was so clearly lacking in any indicia of probable cause so as to render official belief in its existence unreasonable because the information therein was stale, vague, misleading and based on the word of informants without credibility, and in exchange for leniency." (Doc. 18-1 at 2.) Because this affidavit was lacking probable cause, Defendant argues all evidence and subsequent search warrants issued following the DDTF's placement of the GPS tracking units are fruit of the poisonous tree. (*Id.* at 11.) Defendant requests the Court quash the search warrants and suppress all physical evidence seized pursuant to the warrants. (*Id.* at 1-2.)

The Government responds there was probable cause to support both Deputy Kearney's application for a search warrant authorizing placement of GPS trackers on the silver Cadillac and the silver van and his application for a search warrant authorizing a search of room 242. (Doc. 25-1 at 10; Doc. 76 at 4.) The Government further argues that if the affidavits accompanying the applications for the search warrants do not show probable cause, the Court should not suppress the evidence because the *Leon* good-faith exception applies. (Doc. 25-1 at 10-11.)

### 1. Standard of Review for Determining Whether Probable Cause Existed to Issue the Warrants Authorizing Placement of the GPS Mobile Tracking Devices

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (citation and internal quotation marks omitted). "In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'"

15

United States v. Hallam, 407 F.3d 942, 948 (8th Cir. 2005) (quoting *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984) (per curiam)); *see also United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986) ("[T]he decision to issue the warrant is to be upheld if supported by substantial evidence on the record."). "When a magistrate relies solely on an affidavit to issue the warrant, only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Farlee*, 757 F.3d 810, 819 (8th Cir. 2014) (citation and internal quotation marks omitted). Therefore, "[r]eviewing courts must give substantial deference to the original determination of probable cause made by the judge who issued the warrant, and that determination will not be set aside unless the issuing judge lacked a substantial basis for concluding that probable cause existed." *United States v. Edmiston*, 46 F.3d 786, 788 (8th Cir. 1995) (citing *Gates*, 462 U.S. at 238–39).

A substantial basis only requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place. *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). Probable cause is determined by looking at the totality of the circumstances. *Walden v. Carmack*, 156 F.3d 861, 870 (8th Cir. 1998). Defendant bears the burden of proving the warrants were issued without probable cause. *Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)).

### 2. Defendant was not entitled to a Franks hearing on this issue.

At the June hearing, Defense Counsel and I discussed that Defendant's motion did not include a motion for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). Defense Counsel clarified that he was requesting a *Franks* hearing regarding the instant search warrant. I indicated that based on his motion papers, I did not think Defendant

had made "a substantial preliminary showing" that he was entitled to a *Franks* hearing. (June Hr'g Trans.) Nonetheless, I reserved my final decision and Defense Counsel was permitted to present evidence related to the *Franks* issue. (*Id.*) Counsel were informed that the June hearing was "the parties' one opportunity to present the evidence that have with respect to . . . their *Franks* hearing, should they be entitled to one." (*Id.*)

In his post-hearing brief, Defendant did not mention *Franks*. However, he did state that he "relies on his original brief to set forth the applicable caselaw and holdings appropriate for these facts and circumstances." (Doc. 73 at 2.) To the extent Defendant asserts that this means he relies on the arguments asserted in his original brief, I will assume Defendant has not waived his request for a *Franks* hearing.

> The Supreme Court in *Franks v. Delaware* held that where a defendant makes a substantial preliminary showing that a false statement was knowingly and intentionally, or with the reckless disregard for the truth, included by an affiant in a search warrant affidavit, and if the allegedly false statement is necessary to a finding of probable cause, the Fourth Amendment requires that a hearing be held at defendant's request. The Supreme Court in *Franks v. Delaware* further held that if, after such an evidentiary hearing, the defendant establishes by a preponderance of evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the search warrant affidavit, and, with the affidavit's false material set to one side, the remaining content of the affidavit is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit. The holding of *Franks v. Delaware* also applies to material that has been deliberately or recklessly omitted from a search-warrant affidavit.

*United States v. Butler*, 594 F.3d 955, 960–61 (8th Cir. 2010) (internal citations omitted).

As discussed above, Defendant did not make "substantial preliminary showing that a false statement was knowingly and intentionally, or with the reckless disregard for the truth, included by an affiant in a search warrant affidavit." In spite of this, Defendant had a hearing where he called witnesses and solicited evidence related to the *Franks* issue.

17

During Defendant's Counsel's examination of Deputy Kearney, who wrote the affidavit in support of the warrant application for the GPS trackers, Deputy Kearney acknowledged that he misstated the amount of loss Defendant suffered at Rhythm City Casino, but the misstatement was not deliberate. Rather, it seems to be the result of a computation error or error in choosing the appropriate time period. (Kearny Aug. Hr'g Test.) Deputy Kearney also explained that he was not provided the dates that other law enforcement officers spoke to informants. (*Id.*) This explains why the dates were not included in the affidavit. (*Id.*) Moreover, to the extent Defendant argues that the affidavit is suspect because information was provided by people who were in custody when they spoke to law enforcement, the Eighth Circuit has "repeatedly rejected any blanket conclusion that an informant's drug use, pending charges, or cooperation is so suspect that it necessarily vitiates probable cause." *United States v. Ketzeback*, 358 F.3d 987, 991 (8th Cir. 2004). Thus, I find that Defendant has not "establish[d] by a preponderance of evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant" in the warrant application. *Butler*, 594 F.3d at 960–61.

3.  *Substantial evidence in the record supports the decision to issue the warrant for the GPS tracking devices.*

At approximately 11:15 a.m. on November 30, 2018, a judge issued a search warrant authorizing law enforcement to place GPS mobile tracking devices on the silver Cadillac and the silver van. (Gov. Ex. 1 at 9.) Defendant argues this search warrant is not supported by probable cause. Therefore, I must determine whether "substantial evidence in the record" supported the decision to issue this search warrant. *Hallam*, 407 F.3d at 948 (citation omitted).

The affidavit in support of the warrant application is found in Government Exhibit 1. To briefly summarize, the affidavit describes the DDTF's investigative work prior to

18

applying for a search warrant. As part of this investigative effort, officers conducted face-to-face meetings with multiple informants (Gov. Ex. 1 at 3-5, 7 ¶¶ 4-9, 17, 27) and spoke with other informants. (*Id.* at 4 ¶¶ 9-11.) Many of these informants corroborated each other's statements. For example, multiple informants interviewed between April and November 2018 stated Defendant was a large-scale methamphetamine distributor in the Dubuque market. In interviews and meetings conducted between April and November 2018, M.S., D.G.F., and R.H. all told investigators that Defendant was one of the largest methamphetamine suppliers in Dubuque. (*Id.* at 4-5,7 ¶¶ 9, 12, 27.) Furthermore, both M.S. and D.G.F. stated Defendant made frequent trips to Kansas City to purchase methamphetamine for distribution in Dubuque. (*Id.* at 3-5 ¶¶ 4-5, 15.) M.S. told Investigator Leitzen that K.S accompanied Defendant on a trip to Kansas City, during which Defendant purchased methamphetamine from a supplier. (*Id.* at 4 ¶ 6.) K.R.S. corroborated M.S.'s claim and confirmed with Investigator Leitzen that K.R.S. accompanied Defendant to Kansas City, and that Defendant purchased methamphetamine from a supplier during that trip. (*Id.* at 4 ¶ 8.) Informants also corroborated that Defendant drove a silver car or silver van. (*Id.* at 5, 7 ¶¶ 12, 17-18, 27.) During an October 10, 2018 meeting with Deputy Kearney, C.M. stated Defendant drove a silver van. (*Id.* at 5 ¶ 17.) During an October 16, 2018 meeting with Investigator Leitzen, D.G.F. also stated Defendant drove either a silver car or silver van. (*Id.* at 5 ¶ 12.) On October 29, 2018, C.I. #12117 also stated Defendant drove a silver van. (*Id.* at 5 ¶ 18.) On November 19, 2018, R.H. told investigators that Defendant drove a silver van and a light-colored Cadillac. (*Id.* at 7 ¶ 27.)

Investigators' independent observations also led them to the silver van and the silver Cadillac. On or about October 19, 2018, investigators observed the silver van parked along with the silver Cadillac at 740 Boyer Street on multiple occasions. (*Id.* at 5 ¶ 19.) The silver van was registered to Defendant. (*Id.*) Additionally, investigators

observed Defendant use the silver Cadillac to travel from the Q Casino to 740 Boyer Street, where investigators observed the silver Cadillac parked with the silver van on multiple occasions. (*Id.* at 5-6 ¶¶ 19, 25.)

Defendant argues the affidavit in support of the search warrant application for the GPS tracking device was "stale, vague, misleading and based on the word of informants without credibility, and in exchange for leniency." (Doc. 18-1 at 2.) Defendant argues that several paragraphs of the affidavit are comprised of vague information. Specifically, Defendant makes the following assertions:

- Paragraphs 4 and 5 are vague because M.S. did not provide Investigator Leitzen with specific dates or weights of alleged drug transactions. These paragraphs are also vague because Deputy Kearney did not provide a date of his conversation with M.S. and did not explain why M.S. wanted to talk to Deputy Kearney. (*Id.* at 3-4; Doc. 73 at 2; Gov. Ex. 1 at 3-4 ¶¶ 4, 9.)

- Paragraphs 6 and 7 are vague because Deputy Kearney could not explain why M.S. was in jail and could not explain how M.S. became aware of K.S.'s alleged trip to Kansas City with Defendant. (Doc. 73 at 2-3). Deputy Kearney also did not provide details of when, why, and how M.S. came to possess K.S.'s phone. (*Id.* at 3). Deputy Kearney also did not provide screenshots of K.S.'s Google Maps history and did not provide details about K.S.'s alleged trip to Kansas City with Defendant such as dates, times, or specific locations. (*Id.*)

- Paragraphs 8 and 9 are vague because K.R.S. did not provide Investigator Leitzen with specific dates K.R.S. and Defendant allegedly traveled to Kansas City, the name of the hotel in which

20

they stayed, or a description of the supplier from whom Defendant allegedly purchased methamphetamine. (Doc. 18-1 at 4; Gov. Ex. 1 at 4 ¶ 8.) The informant, M.S., also did not provide Investigator Leitzen with specific dates or weights of alleged drug transactions. (Doc. 18-1 at 3-4; Doc. 73 at 3; Gov. Ex. 1 at 3-4 ¶¶ 9.)

- Paragraph 10 contains false information because Defendant's name was only found on an envelope in a backpack near the motor vehicle crash in Muscatine. (Doc. 73 at 4.) Defendant's name was not found in spiral notebooks. (*Id.*)

- Paragraphs 11 through 16 are vague because another informant, D.G.F., claims to have exchanged coded drug text messages with Defendant that Deputy Kearney described as "vague" and that could have been referencing food, not drugs. (Doc. 18-1 at 4-5; Doc. 73 at 4; Gov. Ex. 1 at 4-5 ¶¶ 11-16.) The information is also vague because Deputy Kearney stated that D.G.F. could not provide any details about Defendant's vehicle other than its color. (Doc. 73 at 4.) Deputy Kearney also did not explain why D.G.F. thought Defendant made trips to Kansas City, and did not include in the affidavit that neither Defendant nor Defendant's vehicles left eastern Iowa. (*Id.*).

- Paragraph 17 is vague because C.M. failed to supply Deputy Kearney with specific dates or locations of alleged drug transactions. (Doc. 18-1 at 5; Gov. Ex. 1 at 5 ¶ 17.) C.M. estimated Defendant transported between five and ten kilograms of methamphetamine to Dubuque on a regular basis. (Gov. Ex. 1 at 5 ¶ 17.) Deputy Kearney failed to disclose that C.M. had been incarcerated for two

21

weeks when C.M. provided this information to Deputy Kearney, and C.M. did not explain why C.M. believed Defendant possessed a handgun.  (Doc. 73 at 4–5.)

- Paragraph 18 is vague because CI #12117 claimed Defendant was a methamphetamine supplier to K.H, but CI #12117 did not specifically explain how CI #12117 knew this.  (Doc. 18-1 at 5; Doc. 73 at 5; Gov. Ex. 1 at 5 ¶ 18.)

- Paragraph 19 contains an omission because Deputy Kearney did not provide registration information for the silver van and a silver Monte Carlo registered to Defendant, which would have shown the car registered to a Delmar, Iowa address.  (Doc. 73 at 5.)

- Paragraph 22 is vague because it references video footage showing E.D. hand something to an unidentified man at Rhythm City Casino, but Deputy Kearney admitted the footage was not clear.  (*Id.*)  Deputy Kearney also stated that officers could not identify what was passed between E.D. and the unidentified man.

- Paragraphs 23 and 24 contain false information because Deputy Kearney misstated Defendant's casino winnings.  (*Id.* at 5-6; Gov. Ex. 1 at 6 ¶¶ 23-24.)

- Paragraph 26 contains false information because Deputy Kearney admitted that C.M. was at 740 Boyer Street only twice, rather than "multiple occasions" as stated in the affidavit.  (Doc. 73 at 6; Gov. Ex. 1 at 6 ¶ 26.)

- Paragraphs 26 and 27 are vague because C.M. did not provide specific dates, times, or locations of alleged gun transactions or visits to K.H.'s residence, nor did C.M. provide specific dates when C.M.

22

allegedly witnessed Defendant possess methamphetamine.  (Doc. 18-1 at 6; Doc. 73 at 6-7; Gov. Ex. 1 at 6-7 ¶¶ 26-27.)

Defendant points to a blemish on every tree in his effort to persuade the Court it does not see a forest.  Defendant attacks almost every paragraph of the supporting affidavit, pointing to what he believes are flaws in the completeness, accuracy, or reliability of the statements.  In so doing, he has identified instances in which individual pieces of information may have been vague or omitted from the affidavit.  However, "[p]robable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Gates*, 462 U.S. at 230).  "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231).

In this case, there is ample evidence on the record to support the decision to issue a search warrant based on Deputy Kearney's affidavit.  The affidavit provided the judge with substantial evidence connecting Defendant to both a methamphetamine distribution operation as well as the silver Cadillac and the silver van.  The DDTF met or spoke with multiple individuals between the end of 2017 and November 2018 who identified Defendant as a large methamphetamine dealer in the Dubuque area who drove either a silver van or silver car.  (Gov. Ex. 1 at 3-7 ¶¶ 4-27.)  This included C.I. #12117 identifying Defendant through a photo lineup as a methamphetamine dealer who drove a silver van.  (*Id.* at 5 ¶ 18.)  Multiple individuals also stated Defendant makes frequent trips to Kansas City to acquire methamphetamine for distribution in the Dubuque area.  (*Id.* at 4-5, 7 ¶¶ 5-6, 8, 15, 27.)  In addition, K.R.S. described how she travelled with

Defendant to Kansas City where Defendant purchased methamphetamine from a supplier for distribution in Dubuque. (*Id.* at 4 ¶ 8).

On October 13, 2018, DDTF observed Defendant drive away from Rhythm City Casino with E.D. and an unidentified white man after observing what DDTF believed to have been a drug transaction between E.D. and the unidentified white man. (*Id.* at 6 ¶ 22.) On October 26, 2018, DDTF observed the silver Cadillac parked at 740 Boyer Street, where DDTF believed Defendant was residing. (*Id.* at 5 ¶ 19.) C.M., an informant, would later identify 740 Boyer Street as Defendant's safehouse in a November 6, 2018 interview with Deputy Kearney. (*Id.* at 6 ¶ 26.) In addition to the silver Cadillac, the silver van was also parked at 740 Boyer Street, and was registered to Defendant. (*Id.* at 5 ¶ 19.) On October 30, 2018, DDTF observed the silver Cadillac at the Q Casino, observed Defendant leave the casino in the silver Cadillac, and later observed the silver Cadillac parked at 740 Boyer Street. (*Id.* at 6 ¶ 25.)

Given the multiple sources providing DDTF with similar allegations concerning Defendant's involvement in a methamphetamine distribution operation, the level of specificity with which the sources described Defendant's trips to Kansas City, DDTF's observation of an alleged drug transaction at the Rhythm City Casino between two individuals with whom Defendant entered and left the casino, and DDTF's observations of Defendant using the silver Cadillac to travel to a suspected drug safehouse, I recommend that the District Court find the information relied upon in the November 30, 2018 affidavit is not vague. To the extent any individual detail can be described as "vague," it does not overcome the totality of the circumstances here, which supports probable cause.

Defendant also argues the affidavit is based on stale information (Doc. 18-1 at 1). Specifically, Defendant cites the Eighth Circuit's decision in *United States v. Button*, which found an affidavit in support of a search warrant insufficient to demonstrate

probable cause. 653 F.2d 319, 326-27 (8th Cir. 1981). Defendant is correct that *Button* found an affidavit insufficient, in part, because law enforcement sought easily movable property (phencyclidine) based on six-month-old information. 653 F.2d at 324, 327. However, recent Eighth Circuit cases addressing crimes of a continuous nature demonstrate that reliance on months-old information is not necessarily grounds for finding the issuing judge lacked substantial evidence in the record to issue the search warrant.

In a crime of a continuous nature, such as large-scale drug trafficking, "the passage of time between the last described act [in an affidavit] and the application for a warrant is less significant." *United States v. Petruk*, 929 F.3d 952, 960 (8th Cir. 2019) (citing *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995)). As in the instant case, law enforcement suspected the defendant in *Petruk* of operating a methamphetamine distribution operation and applied for a warrant to install GPS trackers on the defendant's vehicles. *Id.* The affidavit, submitted in support of the search warrant application in September 2016, was based on information acquired between July and September 2016. *Id.* In finding the information used in the affidavit was not stale, the Eighth Circuit noted that it had previously found three-year-old information in an affidavit was not stale because the crime was of a continuing nature. *Id.* (citing *Maxim*, 55 F.3d at 397). Given the continuing nature of the alleged crime, I find that the information relied upon in the November 30, 2018 affidavit was not stale, especially given the fact that DDTF observed Defendant take the silver Cadillac from the Q Casino as recently as October 30, 2018 (Gov. Ex. 1 at 6 ¶ 25), and DDTF conducted in-person interviews with informants as recently as November 19, 2018. (*Id.* at 7 ¶ 27.)

Defendant also argues that the informants the DDTF interviewed for the affidavit lack credibility because law enforcement omitted multiple informants' criminal histories. (Doc. 18-1 at 10.) A court need not disregard information in an affidavit supplied by an

25

informant with a criminal history. *Ketzeback*, 358 F.3d at 991 (finding probable cause existed for a warrant when the affidavit in support was based on information provided by a confidential informant shortly after the confidential informant was arrested and admitted drug involvement). Even if specific criminal histories were not supplied, law enforcement indicated that some meetings with informants took place in the Dubuque County Jail or occurred shortly after an informant was arrested. (Gov. Ex. 1 at 4-7 ¶¶ 8-9, 11, 17, 26-27.) Thus, the judge was not wholly unaware the affiant was relying on informants with criminal histories or at least criminal charges.

As the Supreme Court found in *Gates*, whether probable cause existed to issue a warrant is decided using a totality-of-the-circumstances approach. 462 U.S. at 230. The Court must "weigh an informant's statements in the context of all the circumstances." *United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001). Thus, a characteristic of an informant that weakens his or her reliability should "be balanced against" those characteristics that strengthen an informant's reliability. *United States v. LaMorie*, 100 F.3d 547, 553 (8th Cir. 1996) (citing *Reivich*, 793 F.2d at 959).

Law enforcement's ability to corroborate informants' statements and to directly interview informants may also establish informants' credibility and reliability. "An informant may . . . be considered reliable if the information he or she supplies 'is at least partially corroborated' by other sources." *United States v. Buchanan*, 574 F.3d 554, 562 (8th Cir. 2009) (quoting *United States v. Humphreys*, 982 F.2d 254, 259 (8th Cir. 1993)). Direct interviews with informants also lend credibility because "there are indicia of reliability in 'the richness and detail of a first hand observation.'" *Id.* at 561 (quoting *United States v. Jackson*, 898 F.2d 79, 81 (8th Cir. 1990)).

Prior to submitting the affidavit, investigators with the DDTF interviewed multiple informants in-person: M.S., K.R.S., C.M., and R.H. (Gov. Ex. 1 at 3-5, 7 ¶¶ 4, 8, 17, 27.) Law enforcement corroborated informants' information through conversations with

26

other informants. For example, in Investigator Leitzen's meeting with M.S. in April 2018, M.S. claimed Defendant makes frequent trips to Kansas City to purchase methamphetamine and distribute it in Dubuque. (*Id.* at 1 ¶ 4; Kearney Aug. Hr'g Test.) In an October 10, 2018 meeting with Deputy Kearney, C.M. also claimed that Defendant regularly transports large amounts of methamphetamine into the Northern District of Iowa. (Gov. Ex. 1 at 5 ¶ 17.) In a November 19, 2018 interview with investigators, R.H. also claimed that Defendant had a relationship with a methamphetamine supplier in Kansas City. (*Id.* at 7 ¶ 27.) In October 2018, D.G.F. spoke with Investigator Leitzen and claimed Defendant travels to Kansas City every one to two weeks to retrieve multiple pounds of methamphetamine for distribution in the Northern District of Iowa. (*Id.* at 5 ¶ 15). C.I. #12117 also corroborated these claims, as C.I. #12117 identified Defendant in a photo lineup as K.H.'s methamphetamine supplier. (*Id.* at 5 ¶ 18.) K.R.S. further corroborated these claims during an interview with Investigator Leitzen near the end of 2017 or beginning of 2018 in which she claimed to have traveled with Defendant to Kansas City. (*Id.* at 4 ¶ 8.) K.R.S. stated that on this trip Defendant met with a methamphetamine supplier in a hotel and purchased methamphetamine for distribution in Dubuque. (*Id.*) As discussed above,[5] K.R.S.'s Google Maps history contained a recent trip to a Kansas City hotel. (*Id.*)

Additionally, law enforcement corroborated informants' information through independent police work. For example, after D.G.F. told Investigator Leitzen on October 16, 2018, that Defendant drives a silver minivan or car, law enforcement observed Defendant leave the Q Casino in the silver Cadillac, and later observed the vehicle at 740 Boyer Street. The fact that investigators conducted in-person interviews

---

[5] *See supra* Section II.A.

with informants and corroborated informants' claims lends credibility to the informants. *Buchanan*, 574 F.3d at 561–62.

Lastly, Defendant argues that the DDTF's informants provided information used in the affidavit in exchange for leniency. (Doc. 18-1 at 2.) Defendant does not provide evidence supporting the conclusion that law enforcement traded leniency for information. Deputy Kearney testified at the evidentiary hearing that law enforcement did not promise leniency to any informants. (Kearney June Hr'g Test.) Absent evidence supporting Defendant's conclusion, there is no reason to find that informants provided the information in the affidavit in exchange for leniency.

As the above offered legal authorities and facts in the record demonstrate, there was sufficient evidence in the record for the judge to conclude probable cause existed to issue the search warrant for the GPS mobile tracking units. However, before making a recommendation regarding Defendant's Motion to Quash Search Warrants and to Suppress Evidence, I also need to address the December 28, 2018 search warrant authorizing a search of 740 Boyer Street, Defendant, the silver van, the silver Cadillac, and unit 388.

### 4.     *Even if the warrant was not supported by probable cause, the Leon good faith exception applies to the warrant.*

The Government argues that even if the Court finds the warrant lacked probable cause, the *United States v. Leon* good faith exception applies to the warrant. (Doc. 76 at 4.) Defendant argues that the affidavit in support of the warrant was so facially lacking in probable cause that law enforcement could not have relied upon it in good faith. (Doc. 18-1 at 9–10); *See United States v. Carpenter*, 341 F.3d 666, 670 (8th Cir. 2003). Reviewing courts should not suppress evidence seized pursuant to the search warrant, even if the reviewing court determines probable cause was absent, if the officers applying for the search warrant acted in objectively reasonable reliance on the issuance of the

28

warrant by a neutral magistrate. *United States v. Leon*, 468 U.S. 897, 922 (1984). Under this "good-faith exception," if a law enforcement officer's reliance on a warrant so issued was objectively reasonable, the evidence seized pursuant to the invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007).

*Proell* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate.[6] *Id.* at 431. The only exception relevant to this case has been asserted by Defendant: that the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render reliance on it unreasonable." (Doc. 18-1 at 11.)

For the reasons set forth above in section III.A.3., *supra*, I disagree that probable cause was lacking. Even if I were to accept, *arguendo*, that the warrant was lacking probable cause, it was not "so lacking" that law enforcements officers' reliance on the warrant was "entirely unreasonable." *See United States v. Stankee*, No. CR14-2026, 2014 WL 3735605, at *5 (N.D. Iowa July 28, 2014) (finding that probable cause supported the search warrant, but alternatively finding that the warrant was not so lacking in probable cause that officer's reliance on issuance of the warrant by a judge was unreasonable), *R. & R. adopted*, 2014 WL 4384325 (N.D. Iowa Sept. 3, 2014). Deputy Kearney's affidavit set out many facts from which a reasonable officer could conclude that probable cause existed to place GPS trackers on the silver Cadillac and the silver van. *See Raban v. Butler*, No. CIV.A. 11-5656, 2012 WL 592328, at ** 2-4 (E.D. Pa.

---

[6] "(1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge 'wholly abandoned his judicial role' in issuing the warrant; (3) when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its existence *entirely unreasonable*'; and (4) when the warrant is 'so facially deficient' that no police officer could reasonably presume the warrant to be valid." *Proell*, 485 F.3d at 431 (citing *Leon,* 468 U.S. at 923).

29

Feb. 22, 2012) (finding that the good-faith reliance exception applied in case of suspected criminal mischief where officer's affidavit provided a circumstantial link between the vandalism and the suspect's residence, provided a motive explaining suspect's involvement, and noted previous alleged behavior on the part of the suspect that was somewhat similar to allegation of criminal mischief).

In determining whether law enforcement's reliance on a warrant was "entirely unreasonable," "[t]he court must look at the objectively ascertainable question of whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted). *Leon* explained that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id.* at 922-23 (footnote omitted).

The good-faith exception routinely applies unless there are extreme circumstances which prevent its application. In *United States v. Herron*, for example, the good-faith exception did not apply because although there was no technical legal deficiency in the affidavits, there was "simply no evidence" in the affidavits linking the suspect to criminal activity. 215 F.3d 812, 814 (8th Cir. 2000).

*United States v. Johnson*, 332 F. Supp. 2d 35, 39 (D.D.C. 2004) is a good example of the basis for finding when the good-faith exception does not apply. *Johnson* held the good-faith exception inapplicable where (1) the affiant failed to describe when information was obtained; (2) the affiant failed to corroborate a sponsoring witness's account of events; (3) the affiant failed to obtain a statement from any witness as to suspect's residence; (4) the information giving rise to the search was stale; and (5) nexus

30

to the location to be searched was never established. Deputy Kearney's affidavit fails in none of these particulars.

*United States v. Hove*, 848 F.2d 137, 139–40 (9th Cir. 1988) found the good-faith exception inapplicable where "the affidavit offer[ed] no hint as to why the police wanted to search th[e] residence[,] . . . d[id] not link th[e] location to the defendant and . . . d[id] not offer an explanation of why the police believed they may find incriminating evidence there; the affidavit simply list[ed] the [suspect's] address as a location to be searched." Once again, Deputy Kearney's affidavit cannot be criticized on any of these bases. *United States v. Gonzales*, 399 F.3d 1225, 1231 (10th Cir. 2005) found the good-faith exception could not apply because the affidavit "completely failed to explain why [the officer] believed the items sought would be found at [suspect's residence]." Again, Deputy Kearney's affidavit is sufficient in this regard.

Simply put, this is not an extreme scenario in which the good-faith exception is inapplicable. Defendant's attack on law enforcement's reliance on the affidavit misapplies the standard to which the Court holds judges issuing search warrants and law enforcement officers executing them. Defendant argues the affidavit in this case was similar to an affidavit the Missouri Court of Appeals found lacked probable cause in *State v. Wilbers*, 347 S.W.3d 552 (Mo. Ct. App. 2011). (Doc. 18-1 at 8-10.) In *Wilbers*, the Missouri Court of Appeals found the affidavit in question did not show probable cause because the affidavit did not provide specific dates of alleged illegal activity, but the *Leon* good faith exception made evidence admissible at trial. 347 S.W.3d at 561–62. Defendant argues the affidavits in *Wilbers* and the present case are so similar that the judge should have found the affidavit failed to show probable cause. (Doc. 18-1 at 8-10.) Defendant cites *United States v. Bain*, 586 F.3d 634, 638 (8th Cir. 2009), in which the Eighth Circuit noted that "judges are presumed to know the law," to argue that the issuing judge should have been aware of *Wilbers*, identified the similarities between the

*Wilbers* affidavit and the present affidavit, and found the present affidavit lacking probable cause. (*Id.* at 9-10.) *Bain* is distinguishable from the present case because the Eighth Circuit found that a trial judge should have been aware of a binding Supreme Court decision. 586 F.3d at 638. Defendant asks the Court to require state judges to be aware of and consider state court decisions outside of their jurisdiction. (*Id.*) Even if *Wilbers* would call for a different conclusion, state court decisions in Missouri are not normally binding in Iowa courts.

Defendant further argues that law enforcement should also have been aware of *Wilbers*, identified similarities between the affidavit at issue in *Wilbers* and the affidavit in the instant case, and declined to execute the search warrant. (*Id.* at 10.) This is not the standard to which the Court holds law enforcement officers tasked with executing a search warrant. As stated above, the proper standard is whether the law enforcement officer's reliance was "objectively reasonable," and the Court asks "whether a reasonably well trained officer would have known that the search was illegal despite a judge's issuance of the warrant." *Jackson*, 784 F.3d at 1231.

It was not objectively unreasonable for law enforcement officers to believe the facts in the affidavit in support of the search warrant application supported the issuing judge's decision. These facts included D.G.F.'s claim that Defendant was a methamphetamine dealer in Dubuque and drove a silver minivan or silver car (Gov. Ex. 1 at 5-6 ¶¶ 11-12), investigators' observation of the silver Cadillac parked at 740 Boyer street (*Id.* at 5 ¶ 19), investigators' review of Rhythm City Casino's October 13, 2018 surveillance footage showing Defendant enter the casino with E.D. and an unidentified white man (*Id.* at 6 ¶ 22), an alleged drug transaction between E.D. and the unidentified white man while at the casino (*Id.*), and Defendant leaving the casino in a silver Cadillac with E.D. and the unidentified white man (*Id.*). Investigators also observed the silver Cadillac at the Q Casino in Dubuque on October 30, 2018, observed Defendant gambling

32

inside the Q Casino, observed Defendant leave the casino in the silver Cadillac, and later observed it parked at 740 Boyer Street.

Based on the foregoing, I find that exclusion of the evidence would be inappropriate, even if a reviewing court concluded the first search warrant lacked probable cause, because it was objectively reasonable for investigators to rely upon the neutral magistrate's conclusion that probable cause existed to attach GPS tracking units to the silver Cadillac and the silver van.

### 5.     Recommendation on Warrant for GPS Mobile Tracking Units

Based on the foregoing, I recommend that the District Court Deny the part of Defendant's Motion to Quash Search Warrants and to Suppress Evidence that applies to the warrant for the GPS mobile tracking units and the evidence obtained pursuant to the warrant. If the District Court finds that the warrant was not supported by probable cause, I recommend that the Court find that any evidence obtain pursuant to the warrant not be suppressed because the *Leon* good faith exception applies to the warrant.

## B.     The Warrant for 740 Boyer Street, Defendant's Person, the Silver Van, the Silver Cadillac, and Unit 388

### 1.     The Warrant as Written

Defendant moves for an order, in relevant part, "quashing the search warrants in this case and suppressing all physical evidence allegedly seized in the Defendant's hotel room, [740 Boyer Street], automobiles and storage unit." (Doc. 18 at 1.) However, Defendant does not specifically address the December 28, 2018 warrant authorizing the search of 740 Boyer Street, the Defendant's person, the silver van, the silver Cadillac, and unit 388. Despite this passing reference, Defendant's brief in support focuses only on the GPS mobile tracking units. (Doc. 18-1 at 2-11.)

Defendant argues only that the warrant is fruit of the poisonous tree (*Id.* at 11) because the affidavit in support of the warrant application partly relies on evidence

33

obtained from the GPS tracking units.  (Gov. Ex. 3 at 16 ¶ 22.)  The November 30, 2018 warrant authorizing placement of the GPS tracking units is the only prior warrant from which the "poisonous fruit" could be derived.[7]  Given my finding that there was substantial evidence in the record supporting the decision to issue the search warrant for the GPS tracking units, the tree bearing fruit in the form of the December 28, 2018 search warrant is not poisonous.  Therefore, I recommend denying Defendant's Motion to Quash Search Warrants and Suppress Evidence.  (Doc. 18.)

Therefore, because Defendant does not assert any independent grounds for suppressing evidence seized pursuant to this warrant, and because I do not find any, I find that evidence seized pursuant to this warrant need not be suppressed.  Moreover, as discussed below, should the District Court find that the warrant for the GPS tracking warrant was not supported by substantial evidence, I still find that evidence seized pursuant to these warrants need not be suppressed because even without evidence obtained from the GPS trackers, the affidavit was still supported by substantial evidence.

**2.**    ***Even if the warrant was not supported by probable cause, the Leon good faith exception applies to the warrant.***

Even if the District Court finds the affidavit in support of the warrant authorizing law enforcement to search 740 Boyer Street, the Defendant's person, the silver van, the silver Cadillac, and unit 388 lacks sufficient evidence on the record supporting the judge's decision to issue the warrant, the evidence need not be suppressed because the *Leon* good faith exception is applicable.  The appropriate analysis under *Leon* is set forth above in section III.A.4.

_____

[7] The warrant authorizing the search of room 242 was not issued until December 30, 2018. (Gov. Ex. 2 at 11, 20.)

34

It was not objectively unreasonable for law enforcement officers to believe the facts in the affidavit in support of the search warrant application supported the issuing judge's decision. The facts included law enforcement's meetings and conversations with informants discussed in Section III.A.4, law enforcement's observation of Defendant leaving 740 Boyer Street with E.D. (Gov. Ex. 3 at 13 ¶ 19), law enforcement's observation of Defendant leaving 740 Boyer Street without duffel bags and returning with two duffel bags (*Id.* at 14 ¶ 20), Deputy Kearney's meeting with R.D. in which R.D. stated R.D. had purchased methamphetamine from Defendant and that Defendant runs a large methamphetamine distribution operation (*Id.* at 14-15 ¶ 21), law enforcement's observation of Defendant engaging in countersurveillance activities such as traveling uncommon routes (*Id.* at 16 ¶ 22), law enforcement's surveillance of jail phones revealing that Defendant had discovered the GPS tracking units (*Id.* at 18 ¶ 26), and law enforcement's observation of Defendant traveling between Alt's Mini Storage and 740 Boyer Street (*Id.* at 16 ¶ 22). Law enforcement also conducted an open air sniff on November 16, 2018 at Alt's Storage Facility. (*Id.* at 12 ¶ 16.) The open air sniff resulted in the canine indicating on unit 388, which was registered to K.H. (*Id.*) Law enforcement had observed Defendant visiting this unit. (*Id.*)

Based on the foregoing, I find that exclusion of the evidence would be inappropriate, even if a reviewing court concluded the first search warrant lacked probable cause, because it was objectively reasonable for investigators to rely upon the neutral magistrate's conclusion that probable cause existed to issue a search warrant authorizing a search of 740 Boyer Street, Defendant's person, the silver van, the silver Cadillac, and unit 388.

### 3. The warrant is still supported by substantial evidence, even if allegedly tainted information is redacted.

Defendant asserts that the warrant was not supported by probable cause because it was based on evidence obtained from the GPS tracking devices and therefore was fruit of the poisonous tree. The Government responds that even if the Court finds that the GPS tracking warrant was not supported by probable cause and thus the GPS information is fruit of the poisonous tree and must be redacted, the warrant as redacted would still include sufficient information for probable cause. (Doc. 25-1 at 17.)

Evidence acquired through a source independent of the taint of a constitutional violation is admissible. *Wong Sun v. United States*, 371 U.S. 471, 487-89 (1963). "A warrant obtained after an illegal search is not an independent source if either of the following are true: if the agents' decision to seek the warrant was prompted by what they had learned" as a result of the unconstitutional search, and if information obtained during that unconstitutional search was presented to the judge and affected the judge's decision to issue the warrant. *United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008) (quoting *Murray v. United States*, 487 U.S. 533, 542 (1988)).

In other words, two questions "must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." *Id.* at 613-14. If removing the tainted information from the warrant removes the basis for probable cause, anything seized in the search based on the warrant must be suppressed. However, if the warrant with the information redacted still contains probable cause, any search based on the warrant was valid, barring other constitutional violations or deficiencies. *Id.* at 616-17 (finding application supported probable cause when reading the untainted portions of the warrant at issue).

36

The paragraphs of the warrant application that contain relevant information obtained from the GPS trackers are reproduced below:

22.　Since December 5th and 6th of 2018, the Dubuque Drug Task Force has been doing surveillance on SEYS . . . while he is mobile in the Chrysler van and the Cadillac CTS. Throughout this time members of the Dubuque Drug Task Force can say through their training and experience that SEYS does appear to be very paranoid, which is consistent with all of the intelligence that has been gathered over the past year.

a.　When SEYS is traveling from place to place it appears as though he takes uncommon travel routes and does appear to be doing counter surveillance.

i.　On December 14th 2018, GPS Tracker shows the Silver Cadillac CTS leaving 740 Boyer around 1900 hours. The vehicle travels to the area of Cooper Place, in Dubuque Iowa. One of SEYS people that deals for him lives on Cooper Place. GPS tracker shows the vehicle driving around the block and through alleys and several times and going in different directions, which is consistent with doing counter surveillance or being paranoid that your [sic] being followed.

ii.　On December 14th 2018, GPS Tracker shows the Silver Cadillac CTS going to ALT Storage facility around 2200 hours, which is located off of Tanzanite drive. After going to the Storage facility, the vehicle then goes back to 740 Boyer St.

. . .

23.　On December 17th, 2018, GPS tracker did show the Silver Cadillac CTS . . . arrive at Rhythm City Casino in Davenport Iowa at 10:59 P.M. The Cadillac then left Rhythm City Casino at 1:39 A.M. and returned to Dubuque Iowa.

24.　. . . . The last GPS ping was found to be at 740 Boyer Street in Dubuque Iowa on 12/23/2018.

(Gov. Ex. 3 at 16-17.)

37

I first find that the police would have applied for the warrant had they not acquired the tainted information. Police officers were aware at the end of 2017 or beginning of 2018 that there was a large-scale methamphetamine dealer in Dubuque, and the investigation had been in progress almost that long. (*Id.* at 5 ¶ 6.) The GPS trackers were installed on November 30, 2018, about one month prior to Deputy Schlosser applying for the warrant on December 28, 2018. The trackers quit working about a month after installation, and provided little of the information included in the affidavit. As will be discussed below, the information obtained from the trackers was largely duplicative of other information contained in the affidavit, and thus was not necessary to establish probable cause.

Second, I find that the affidavit supports probable cause after the tainted information has been redacted from it because most of the information is duplicative of information that was obtained from other sources and is presented in the application in other paragraphs.

Paragraph 22 is derived from GPS data and describes Defendant's paranoia, presumably because of his drug dealing. However, paragraphs 10(e) and 21(b) also document Defendant's paranoia and the steps he took to keep drug transactions secret. Thus the absence of Paragraph 22 does not change my finding that substantial evidence supported probable cause for the warrant. (*Id.* at 9, 14-15.) The information related to Cooper Place, itself, was not necessary to establish paranoia and that specific location does not have particular significance to this case.

To the extent Defendant is arguing that redacting Paragraph 22, which mentions unit 388, means that the items seized during the search of unit 388 must be suppressed, that argument is without merit. There is substantial evidence in the remaining paragraphs to support probable cause to search unit 388. K.H. rents unit 388. (*Id.* at 12 ¶ 16.) The warrant affidavit establishes a connection between K.H. and Defendant because

38

Defendant was K.H.'s source and because Defendant and K.H. both lived at 740 Boyer Street. (*Id.* at 9 ¶ 11; 10 ¶ 12; 11-12 ¶¶ 14, 15.) In addition, police surveillance of Defendant showed that Defendant visited unit 388. (*Id.* at 12 ¶16.) As a result of this surveillance, Deputy Kearny and his K-9 partner Odim conducted an open-air sniff of unit 388 and Odim alerted on it. (*Id.*) Three subsequent open-air dog sniffs conducted by the Dubuque County Sheriff's Office K-9 Unit at unit 388 resulted in dogs indicating on it. (*Id.*) The most recent alert occurred just days before the warrant was signed. (*Id.*)

The information in paragraph 23 related to Rhythm City can be redacted without changing the fact that substantial evidence still supports probable cause for the warrant. Paragraph 13 documents what surveillance footage from the Rhythm City Casino showed occurred on October 13, 2018, including an exchange of cash for a bag containing an unidentified white substance between Defendant's girlfriend and an unidentified man. (*Id.* at 11.) Paragraphs 13 and 14 further document that Defendant frequents casinos. (*Id.*) Thus, the absence of paragraph 23 will not affect probable cause.

To the extent Defendant argues that the GPS tracking information was necessary to tie Defendant to the Cadillac or van, the rest of the warrant contains ample information from multiple sources making the connection between Defendant, a silver Cadillac and a silver van, and use of those vehicles in the commission of drug trafficking offenses to justify the search warrant for these vehicles. (*Id.* at 7 ¶ 9; 8-9 ¶¶ 10(a)-12; 11 ¶¶ 13(b)-14; 13 ¶¶ 17, 19; 14 ¶ 21(a).)

Substantial evidence supports the conclusion that even with information obtained from the GPS tracker redacted, the totality of the circumstances set forth in the affidavit point to "a fair probability that contraband or evidence of a crime [would] be found" at the particular locations listed in the warrant. *Reed*, 921 F.3d at 757.

39

### 4.    Conclusion

Accordingly, even if the District Court finds that the GPS evidence in the affidavit is the fruit of a poisonous tree, I recommend that evidence seized pursuant to the warrant should not be suppressed.

### C.    Defendant's Motion to Suppress Hotel Room Search and Supplemental Motion to Suppress

Defendant argues that all evidence seized in the search of room 242 must be suppressed because the affidavit in support of the application for the warrant "was so clearly lacking in any indicia of probable cause so as to render official belief in its existence unreasonable." (Doc. 74 at 9.)  In addition, Defendant argues that because the warrant for the GPS trackers was lacking in probable cause, and because evidence obtained from the trackers was included in the affidavit, all evidence seized in the search of room 242 is fruit of the poisonous tree.  (*Id.*)  Moreover, Defendant made a request for a *Franks* hearing related to this warrant because he alleged prior to the hearings that the search warrant contained materially false or at least misleading statements and stale information, and omitted relevant information. (*Id.*)  Defendant's supplemental motion asserts that information in the affidavit was stale.  (Doc. 62 at 1.)  Although Defendant acknowledges that drug distribution is a crime of a continuing nature, he asserts that the information contained in the affidavit was months old and did not contain any "factually connected, recent, time-specific information to provide a substantial basis" to support issuance of the warrant.  (Doc. 62-1 at 3) (quoting *United States v. Day*, 949 F.2d 973, 978 (8th Cir. 1991)).

For support, Defendant again cites numerous paragraphs from the affidavit. Defendant also cites the video of the dog sniff and asserts that the K-9 handler was "overly suggestive" to Mali by sweeping room 242 three times when he only swept the other

40

rooms once. (Doc. 74 at 8.) Defendant further argues that Mali also indicated on a door across the hall from room 242, the utility closet.

The Government responds that Defendant's assertions regarding Mali's sniff are only "conclusory statements [based on] his own, untrained, interpretation of the surveillance video in this case." (Doc. 76 at 7.) The Government further asserts that the only evidence related to the sniff is testimony from the dog's handler who said Mali only alerted on room 242 and that if Mali had alerted on more than 1 room, officers would have sought warrants for more than one room. (*Id.*) This testimony was not challenged by another K-9 handler. (*Id.*)

Although the Government acknowledges that some of the information in warrant is months old, it asserts that the allegedly stale information is "historical information" that is supplemented with newer information, including information of the K-9 alert, information connecting Defendant to 40 pounds of methamphetamine since September 2018, a search of Defendant's car that yielded a small amount of methamphetamine and packaging material, the discovery of $10,000 on Defendant's person, and knowledge that room 242 was registered to Defendant and that Defendant had been in the room. (*Id.*)

The Government further asserts that even assuming, arguendo, that the GPS warrant was invalid, the hotel room warrant was valid because under *United States v. Swope*, 542 F.3d 609 (8th Cir. 2008), the judge would still have signed the warrant, even without the GPS information. (Doc. 25-1 at 16-17.) Finally, the Government argues that even if the warrant was invalid, under *Leon*, the good faith exception applies and therefore, any evidence seized pursuant to the warrant should not be suppressed. (Doc. 76 at 4.)

## 1.    Defendant has not established a violation of his rights under Franks v. Delaware.

Defendant's assertion that the affidavit in support of the warrant to search room 242 contains "a materially false statement, or . . . a material misstatement of facts" (Doc. 20-1 at 2-3) does not state a colorable claim of a violation of Defendant's rights under *Franks v. Delaware*, 438 U.S. 154 (1978).  In *Franks*, the United States Supreme Court held that, under certain circumstances, a defendant is entitled to a hearing to "challenge the veracity of a sworn statement" police used to obtain a search warrant:

> In the present case the Supreme Court of Delaware held, as a matter of first impression for it, that a defendant under *no* circumstances may so challenge the veracity of a sworn statement used by police to procure a search warrant.  We reverse, and we hold that, where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and . . . the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request.

438 U.S. 154, 155–56 (1978) (emphasis in original).  Showing deliberate or reckless falsehood is "not lightly met."  *United States v. Lucca*, 377 F.3d 927, 931 (8th Cir. 2004) (quoting *United States v. Wajda*, 810 F.2d 754, 759 (8th Cir. 1987)).  A defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false; and [the allegations] should be accompanied by a statement of supporting reasons."  *Id.* (quoting *Franks*, 438 U.S. at 171) (alterations in original).

Defendant's claim of a *Franks* violation rests only on Defendant's unsupported allegations concerning Mali's sniff.  In the interest of judicial economy, the Court proceeded with a *Franks* hearing during the June evidentiary hearing. (June Hr'g Test.)  Defendant alleges that Mali alerted to a second door in addition to room 242, and Deputy Kearney failed to include this fact in his affidavit.  (Doc. 20-1 at 2-3).  While Defendant claims the door Mali allegedly alerted on was room 241 (*Id.* at 4), Deputy Sitzman stated

42

the door Defendant references opens to a utility closet. (Sitzman June Hr'g Test.) Specifically, Defendant claims that paragraph 40 of Deputy Kearney's application for a search warrant for room 242 omits this material fact, as the paragraph states "Mali sniffed doors to nine (9) other rooms then gave a positive indication outside the door for room 242." (Gov. Ex. 2 at 11 ¶ 40; Doc. 20-1 at 3.)

However, Deputy Sitzman testified at the June evidentiary hearing that Mali did not alert to any room other than room 242. (Sitzman Hr'g Test.) If Mali alerted to a second door, this information would have been included in the warrant application. (*Id.*) Defendant did not offer additional evidence to support his claim that Mali indicated in front of another room. Defendant did not challenge Deputy Sitzman's or Mali's training or proffer any reason to doubt Deputy Sitzman's interpretation of Mali's behavior. Thus, Defendant has not made a "substantial preliminary showing" that Deputy Kearney "knowingly and intentionally," or with reckless disregard for the truth" included a false statement in his affidavit when Deputy Kearney did not state that Mali indicated on another room. *Franks*, 438 U.S. at 155-56. Therefore, Defendant has not stated a colorable assertion of a violation of his rights under *Franks v. Delaware*.

### 2. Substantial evidence in the record supports issuance of the warrant to search room 242.

At approximately 1:00 a.m. on December 30, 2018, a judge issued a search warrant authorizing law enforcement to search room 242 at the Hilton Garden Inn in Dubuque, Iowa. (Gov. Ex. 2 at 11, 20.) Defendant argues this search warrant is not supported by probable cause. Therefore, I must determine whether "substantial evidence in the record" supported the decision to issue this search warrant. *Hallam*, 407 F.3d at 948 (citation omitted).

The factual recitation of the affidavit in support of the application for the warrant to search room 242 is found in Government Exhibit #2. To briefly summarize, the

affidavit first cites many of the interviews and observations described in the affidavit in support of the search warrant for the GPS mobile tracking devices, and then describes subsequent investigative work done after DDTF placed GPS units on the silver Cadillac and the silver van.

This subsequent investigative work following placement of the GPS units can be divided into five categories: 1) subsequent interviews with informants; 2) surveillance conducted on Defendant while he was located at 740 Boyer Street; 3) surveillance conducted on Defendant via the GPS units; 4) open-air sniffs conducted on unit 388; and 5) surveillance and an open-air sniff conducted at the Hilton Garden Inn. The following analysis focuses on Mali's indication on room 242 because, for the purpose of determining whether substantial evidence in the record supports the decision to issue the warrant to search room 242, this is dispositive and shows substantial evidence supports the decision.

Defendant argues the affidavit in support of the search warrant application to search room 242 was based on false and misleading information. (Doc. 20-1 at 2.) Specifically, Defendant asserts that paragraph 40 contained "false and misleading" information regarding the open-air sniff conducted outside of room 242. (*Id.*) Defendant alleges his rights under *Franks* were violated, alleging Mali indicated on room 241 in addition to room 242. As detailed above, Defendant has not stated a colorable violation of his rights under *Franks*. Mali's indication on room 242 is sufficient to establish probable cause for DDTF's search of room 242. Furthermore, the open-air sniff did not violate Defendant's Fourth Amendment rights.

First, the open-air sniff in the hotel hallway did not violate Defendant's Fourth Amendment rights because "a trained dog's detection of odor in a common corridor does not contravene the Fourth Amendment." *United States v. Roby*, 122 F.3d 1120, 1125 (8th Cir. 1997). In *Roby*, the Eighth Circuit found a hotel guest's expectation of privacy

did not extend to the hallway outside of his room. *Id.* "Neither those who stroll the corridor nor a sniff dog needs a warrant for such a trip." *Id.* Applied to the present case, Mali's open-air sniff in the hallway outside room 242 did not violate Defendant's Fourth Amendment rights.

Second, Mali's indication on room 242 is sufficient to establish probable cause for DDTF's search of room 242 because Mali is properly trained and certified, and Defendant has not contested this. Absent evidence contesting a canine's certification status, "[i]f a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume . . . that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013). Deputy Sitzman testified during the evidentiary hearing that Mali is properly certified, and Defendant did not provide evidence contradicting this or contest this statement. (Sitzman Hr'g Test.)

Defendant attempted to cast doubt on Mali's reliability by pointing out that Mali may indicate on residual drug material (*Id.*), but the Supreme Court has rejected this argument. In overturning the Florida Supreme Court in *Harris*, the Court criticized the Florida Supreme Court for treating a dog's indication on residual drug material as grounds for questioning the dog's reliability:

> The Florida Supreme Court treated a dog's response to residual odor as an error, referring to the "inability to distinguish between [such] odors and actual drugs" as a "facto[r] that call[s] into question Aldo's reliability." But that statement reflects a misunderstanding. A detection dog recognizes an odor, not a drug, and should alert whenever the scent is present, even if the substance is gone . . . . In the usual case, the mere chance that the substance might no longer be at the location does not matter; a well-trained dog's alert establishes a fair probability—all that is required for probable cause—that either drugs or evidence of a drug crime . . . will be found.

*Harris*, 568 U.S. at 246 n.2. Therefore, the possibility that Mali may have indicated on residual drug material does not bring his reliability into question.

45

Finally, as discussed above, I do not find the information contained in the affidavit stale. The on-going nature of drug conspiracies and Defendant's alleged role in drug distribution in the Dubuque area make the time parameters of the information contained in the affidavit necessary to explain the breadth of Defendant's alleged crimes. Moreover, older information is supplemented with very recent information, including Mali's alert on the door of Defendant's hotel room—a room Defendant had been in that day; the suspected methamphetamine seized from Defendant's car on December 30, 2018; and the large amount of money seized from Defendant's person on December 30, 2018.

Given that an open-air sniff in a hotel corridor does not violate a guest's Fourth Amendment rights, that Defendant did not contest the Government's assertion that Mali is properly certified, the United States Supreme Court's decision in *Harris* finding a properly certified dog indicating on a location provides probable cause for a search, and the wealth of additional information found in the warrant application, I find the totality of the circumstances weighs in favor of the Dubuque County judge's decision to issue the warrant for room 242 and substantial evidence in the record supports this decision. As such, if there is no other reason to suppress evidence seized from the hotel room, I find the evidence need not be suppressed.

### 3. *Even if the warrant was not supported by probable cause, the Leon good faith exception applies to the warrant.*

Even if the District Court finds the affidavit in support of the warrant authorizing law enforcement to search room 242 lacks sufficient support for the judge's decision to issue the warrant, the evidence need not be suppressed because the *Leon* good faith exception is applicable. The appropriate analysis under *Leon* is set forth above in section III.A.4. It was not objectively unreasonable for law enforcement officers to believe the facts in the affidavit in support of the search warrant application supported the issuing

judge's decision. The facts included, most importantly, DDTF canine Mali's open-air sniff during which Mali indicated outside of room 242. (Gov. Ex. 2 at 11 ¶ 40.) As discussed in Section III.C.2., a properly trained dog's alert provides probable cause to conduct a search. *Harris*, 568 U.S. at 246–47. Based on the foregoing, I find that exclusion of the evidence would be inappropriate, even if a reviewing court concluded the first search warrant lacked probable cause, because it was objectively reasonable for investigators to rely upon the neutral magistrate's conclusion that probable cause existed to search room 242.

### 4. *The warrant is still supported by substantial evidence, even if allegedly tainted information is redacted.*

Although he does not make a specific argument related to the search of room 242, Defendant argues that "[a]ll evidence obtained [from the GPS warrant], including any subsequent search warrants, . . . are fruits of the poisonous tree." (Doc. 18-1 at 11.) The Government responds that there is ample evidence in the affidavit to support probable cause, even without the GPS tracking information.

Under *Swope*, I must ask two questions: "first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them." 542 F.3d at 613-14. I must answer, "Yes" to both questions to find that evidence seized pursuant to the warrant need not be suppressed. *Id.* at 616-17.

The paragraphs of the warrant application that contain relevant information obtained from the GPS trackers are reproduced below:

> 29. Since December 5 and 6 2018, the Dubuque Drug Task Force has been doing surveillance on SEYS . . . while he is mobile in the Chrysler van and the Cadillac CTS. Throughout this time members of the Dubuque Drug Task Force can say through their training and experience that SEYS does appear to be very paranoid, which is

47

consistent with all of the intelligence that has been gathered over the past year.

30.    When SEYS is traveling from place to place it appears as though he takes uncommon travel routes and does appear to be doing counter surveillance.

31.    On December 14, 2018, GPS Tracker shows the Silver Cadillac CTS leaving 740 Boyer around 1900 hours. The vehicle travels to the area of Cooper Place, in Dubuque Iowa.  One of SEYS people that deals for him lives on Cooper Place.  GPS tracker shows the vehicle driving around the block and through alleys and several times and going in different directions, which is consistent with doing counter surveillance or being paranoid that you are being followed. On December 14, 2018, GPS Tracker shows the Silver Cadillac CTS going to ALT Storage facility around 2200 hours, which is located off of Tanzanite drive.  After going to the Storage facility, the vehicle then goes back to 740 Boyer St.

32.    On December 17, 2018, GPS tracker did show the Silver Cadillac CTS . . . arrive at Rhythm City Casino in Davenport Iowa at 10:59 P.M. The Cadillac then left Rhythm City Casino at 1:39 A.M. and returned to Dubuque Iowa.

33.    . . . . The last GPS ping was found to be at 740 Boyer Street in Dubuque Iowa on December 23, 2018.

(Gov. Ex. 2 at 9-10.)

I first find that the police would have applied for the warrant had they not acquired the tainted information, especially considering that new information contained in the warrant is related specifically to room 242.  (*Id.* at 10-11 ¶¶ 36-40.)  In addition, all the same reasons that applied to the warrant for 740 Boyer Street, Defendant's person, the silver van, the silver Cadillac, and unit 388, apply here. Police had been investigating Defendant's alleged methamphetamine dealing and distribution operation for about a year.  They had collected evidence and information over that time and the GPS tracker information was but a small amount of the information.   And, as was discussed above, the information obtained from the trackers was largely duplicative of other information contained in the affidavit, and thus was not necessary to establish probable cause.

48

Second, I find that the application affidavit supports probable cause after the tainted information has been redacted from it because most of the information is duplicative of information that was obtained from other sources and is presented in the application in other paragraphs.

But for some grammatical differences, paragraphs 29-33 of the hotel warrant affidavit, above, are identical to paragraphs 22 and 23 of the warrant affidavit for 740 Boyer Street, Defendant's person, the vehicles, and unit 388. Paragraphs 29-33 are similarly duplicative in the warrant affidavit for room 242. (*Id.* at 6-9 ¶¶ 9, 11, 13-19, 28.) Redacting the paragraphs containing information from the GPS tracker does require suppression of evidence seized pursuant to the hotel warrant.

In addition, the hotel warrant, like the warrant for warrant for 740 Boyer Street, Defendant's person, the vehicles, and unit 388, still establishes a connection between K.H., Defendant, and the target vehicles, even with the allegedly tainted information redacted, because this warrant contains untainted information identical to that discussed above. (*Id.* at 6-7 ¶¶ 10-11, 16-17.) For the same reason, the identical paragraphs in the hotel warrant also establish Defendant's connection between casinos, a probable drug sale at a casino, and the vehicles at issue in this case. (*Id.* at 5-9 ¶¶ 6, 8-11, 14, 16, 20, 24, 26-28.)

With the evidence redacted, the warrant still contains substantial evidence to support probable cause, especially considering the new evidence of (1) Mali's alert; (2) the large amount of cash found on Defendant's person; (3) the small amount of suspected methamphetamine, drug packaging material, and paraphernalia found in the search of the silver Cadillac; and (4) the actions of Defendant's girlfriend in the parking lot of the hotel that were consistent with drug sales. (*Id.* at 11 ¶¶ 37-40.)

Substantial evidence supports the conclusion that even if information obtained from the GPS tracker is redacted, the totality of the circumstances set forth in the affidavit

point to "a fair probability that contraband or evidence of a crime [would] be found" at the particular locations listed in the warrant. *Reed*, 921 F.3d at 757.

### 5. Conclusion

For the foregoing reasons, I recommend denying Defendant's motion to suppress.

## D. Defendant's Motion to Dismiss should be denied.

### 1. Relevant Facts

Deputy Kearny and DNE Agent Josh Mulnix set up a "Milestone Camera" in the residence across from 740 Boyer street on November 30, 2018 to conduct surveillance. Defendant's Exhibit 1 to his motion to dismiss is Deputy Kearney's Supplementary Report. It is undated, but appears to have been drafted after the third week of January, 2019 when the camera was removed. The camera did not save video the way the he thought it would. Although the City of Dubuque has many traffic cameras stationed around Dubuque, it only has two moveable cameras dedicated to police surveillance. (Kearny Aug. Hr'g Test.) Both cameras were already in use when officers wanted to conduct surveillance of 740 Boyer. (*Id.*) Because of a shortage of cameras, investigators in this case had to use a State of Iowa camera to conduct surveillance. (*Id.*) City of Dubuque cameras save footage for 30 days. (*Id.*). This is how long Deputy Kearny and other officers assumed the state camera would also save video footage. (*Id.*) The camera ran 24-hours a day and was not simultaneously monitored by a police officer all that time. However, under both systems officers could on a Monday, for example, access footage from the prior weekend. (*Id.*) Eventually, Deputy Kearny became aware that he did not actually know what the camera's "look back" period was. (*Id.*) In other words, he was initially unaware how long after footage was recorded, he could go back and review it.

In mid-December, DDPD became aware that the state did not save footage for 30 days. (*Id.*) At that time, Officer Kearny learned that if he had wanted his footage saved, he should have provided hard drives to the state. (*Id.*) Officer Kearny never provided

50

hard drives to the state. (*Id.*) Surveillance continued at 740 Boyer until mid-January 2019. Throughout the time Officer Kearny was conducting surveillance of 740 Boyer using the Milestone camera, he took screen shots of anything he found "significant."

### 2. Analysis

*United States v. Bugh* held:

> It is well established that the Government may not in good or bad faith suppress evidence favorable to the accused. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963). "If, however, the evidence in question is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of the police to make out a due process violation." *United States v. Houston,* 548 F.3d 1151, 1155 (8th Cir.2008) (citing *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 102 L.Ed.2d 281 (1988)). The burden is on the defendant to demonstrate the evidence was destroyed in bad faith, *Webster*, 625 F.3d at 447, and negligent destruction of evidence is insufficient to establish a due process claim, *Houston*, 548 F.3d at 1155, 701 F.3d 888, 894–95 (8th Cir. 2012).

701 F.3d 888, 894-95 (8th Cir. 2012).

Defendant argues the Government's failure to preserve this video was a violation of his due process rights because material contained in the video is exculpatory and contradicts statements made by informants quoted in the warrants. (Doc. 34-1 at 4-5.) Defendant first argues that because the surveillance footage is material and exculpatory, whether the Government acted in good faith is irrelevant. (*Id.*) *California v. Trombetta*, held,

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, *see United States v. Agurs*, 427 U.S. at 109–110, 96 S. Ct., at 2400, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means. Neither of these conditions is met on the facts of this case.

51

467 U.S. 479, 489 (1984). Defendant admits "it is difficult for Mr. Seys to precisely identify the materiality and the exculpatory nature of the camera evidence since the Government failed to preserve it and now neither party nor the Court can view the video from the camera." Nevertheless, Defendant asserts that "[t]he video would have accurately shown the number, nature and identity of visitors to the property during the time the camera was installed. (Doc. 34-1 at 5.) Mr. Seys' [sic] contends that the video would not have shown the visits and other claimed observations of the officers." (*Id.*) Defendant argues that the video will show, among other things, that certain people were not at 740 Boyer Street or were there for innocent reasons such as home repair. (Doc. 75 at 4-6.) In essence, Defendant argues that the exculpatory nature of the surveillance footage would simply be that it contradicts, in some fashion, law enforcement reports regarding what the footage showed.

The evidence does not show when the footage became unavailable. The testimony did not establish that the evidence was periodically deleted (e.g., once per week deletion of evidence of a specified age) or continuously deleted (e.g., all footage more than one week old was deleted). The only evidence was that the "look back" period must have been at least a few days because law enforcement could review weekend recordings on the following Monday. (Kearny Hr'g Test.) In one sense, this makes it more difficult to determine whether the footage's alleged exculpatory value was apparent *before* it was destroyed. Nevertheless, Defendant bears the burden of showing that the missing evidence met that standard when it was lost. *United States v. LeBeau*, 867 F.3d 960, 976–77 (8th Cir. 2017) (affirming district court's decision to deny defendant's motion to dismiss based on government's failure to preserve surveillance video footage); United *States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016) (citing *United States v. Gomez*, 191 F.3d 1214, 1218 (10th Cir.1999)); *United States v. Webster*, 625 F.3d 439, 446 (8th Cir. 2010). In the case at bar, Defendant has not shown that – whenever the

footage might have been deleted – it was apparent to Deputy Kearney or any other law enforcement officer what was shown contradicted their report on who was coming and going or their other observations.

Moreover, although Defendant acknowledges that to meet the *Trombetta* standard, the evidence must "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means," he has not attempted to make such a showing. 467 U.S. at 489. On the contrary, the record shows that Defendant set up a "night owl" surveillance system at his home that recorded video footage later seized by law enforcement. (Kearny Hr'g Test.) Defendant provided his written consent to law enforcement to search the surveillance system's outside cameras. (*Id.*) However, Defendant has not provided a password that would permit law enforcement to view footage that was retained in the system. (*Id.*) Attempts to search the system without a password were unsuccessful. (*Id.*)

Whether Defendant can be compelled to provide a password is beyond the scope of this report and recommendation. Neither party has requested the Court consider that issue. Defendant may have strategic or legal reasons for not making the footage from his own surveillance cameras available. Nevertheless, the existence of this surveillance footage significantly undercuts his argument that he could not obtain comparable evidence by other reasonable means. He has not shown that the system failed to record similar footage, that it malfunctioned or that the footage was otherwise inaccessible or unrelated. Therefore, I recommend the District Court rule that the footage from the Milestone camera was not shown to be exculpatory, that its exculpatory nature was not apparent when it was destroyed, and that there is no showing that Defendant could not obtain comparable evidence by other reasonable means.

Defendant further asserts that if the Court finds the evidence is not exculpatory, but merely potentially useful, the Government's failure to preserve it was bad faith and

53

Defendant has no opportunity to cross-examine officers regarding what they claim to have observed on the video. (Doc. 34-1 at 6; Doc. 75 at 7.) Specifically, Defendant argues that the Government could have preserved the video by purchasing an external hard drive for less than $100, and the 17.41 gigabytes of discovery the Government has already provided indicates its ability to do so. (Doc. 43 at 1.) Therefore, Defendant has no opportunity to argue how he is prejudiced by what *would have been shown* on the video and the indictment must be dismissed. (*Id.* at 2.) Deputy Kearney testified, however, that at the time he learned that the State was not preserving all the footage, he believed it was no longer possible to preserve that footage. (Kearny Hr'g Test.) Thus, while preservation of the footage on hard drive was possible at some point in time, by the time Deputy Kearny was aware of the possibility, it was too late.

The Government argues that Defendant's assertions are mere speculation and cannot support a *Brady* violation. (Doc. 40-1 at 3.) To establish a *Brady* violation, Defendant must show the Government suppressed evidence that was both favorable to him and "material to the issue of guilt or punishment." *United States v. Williams*, 577 F.3d 878, 882 (8th Cir. 2009). Evidence is "material" if there is a "reasonable probability" that, had it been disclosed, "the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999). Allegations based solely on "conjecture and speculation, cannot support a *Brady* violation." *United States v. Horton*, 756 F.3d 569, 575 (8th Cir. 2014).

Here, it appears law enforcement officers assumed the state kept videos as long as the City of Dubuque. The record in the case at bar establishes, at best, negligent failure to preserve evidence. Such negligence is insufficient to establish a due process violation. *Bugh*, 701 F.3d 895. Defendant can raise the issue at trial to try to establish reasonable doubt or can ask for a spoliation instruction. (Doc. 40-1 at 3.) In addition, the surveillance video evidence is a small portion of the Government's evidence in this case.

54

(*Id.* at 4.)  Finally, the Government argues that Defendant could prove that K.B. was not at 740 Boyer because he has the password to his own surveillance system seized during the search of 740 Boyer, but refuses to divulge the password.  (Doc. 77 at 4.)

Here, there is no evidence of bad faith on behalf of law enforcement.  Deputy Kearney testified that he did not intentionally "get rid of" any evidence, including evidence that would be exculpatory.  The evidence does not support a conclusion that the deletion of the footage from the State's server was the product of the Government's or the investigators' efforts to deprive Defendant of evidence that might exculpate him or was otherwise orchestrated in bad faith.  Deputy Kearney's knowledge that the footage was destroyed is consistent with the testimony in *Bugh*,

> At trial, the jury heard numerous audio recordings of phone conversations between Nowland and Bugh. Officer Nelson testified, however, that he erased the phone conversations he recorded on January 6, 2011. He stated: "I was actually surprised when I went to download all the calls that those calls weren't on the recorder, but they just weren't."

701 F.3d at 892.  As in *Bugh*, the failure to preserve the evidence "was at worst negligent[8] and, therefore, insufficient to establish a due process violation."  *Id.* at 895.

## IV.  CONCLUSION

For the foregoing reasons, I respectfully recommend Defendant's Motion to Quash Search Warrants and Suppress Evidence **(Doc. 18)**; Defendant's Motion to Suppress Hotel Room Search **(Doc. 20)**; Defendant's Supplemental Motion to Suppress **(Doc. 62)**; and Defendant's Motion to Dismiss **(Doc. 34)** all be **denied**.

---

[8] I do not recommend that the District Court find Deputy Kearney negligent.  Such a finding is unnecessary to ruling on this matter.  Moreover, the destruction of the evidence was clearly unintentional. There was no evidence regarding the applicable standard of care under these circumstances to make such a determination, if it were necessary.

**To allow for an expedited final ruling**, objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) must be filed within **SEVEN (7) days** of the service of a copy of this Report and Recommendation. *See United States v. Vasquez-Martinez*, No. 6:05CR60016-001, 2006 WL 376474, at *8 (W.D. Ark. Feb. 9, 2006) (seven days for objections); *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 925 (D. Minn. 2018) (referral order included order for expedited review of R. & R.).

Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** this 8th day of October, 2019.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa

56