**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ‖ | |
| Plaintiff, | ‖ | No. 19-CR-1004-CJW-MAR |
| vs. | ‖ | **ORDER** |
| BRANDON JAMES SEYS, | ‖ | |
| Defendant. | ‖ | |

_____

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................. 2

II.  STANDARD OF REVIEW.............................................................. 3

III. DEFENDANT'S MOTION TO SUPPRESS ........................................ 7

    A.   Factual Background................................................................ 7

    B.   Analysis................................................................................17

        1.   GPS Warrant ...............................................................17

        2.   Hotel Warrant ..............................................................21

IV. DEFENDANT'S MOTION TO DISMISS.............................................23

    A.   Factual Background...............................................................23

    B.   Analysis................................................................................24

V.  CONCLUSION .............................................................................26

# I.    INTRODUCTION

This matter is before the Court on a Report and Recommendation ("R&R") (Doc. 86) of the Honorable Mark A. Roberts, United States Magistrate Judge.  On May 16, 2019, defendant filed a Motion to Suppress.  (Doc. 18).  On May 21, 2019, defendant supplemented the motion.  (Doc. 20).  On May 22, 2019, the government moved for an extension of time to file a response, which was granted by the Court.  (Docs. 22 & 23). On May 29, 2019, the government timely filed a resistance.  (Doc. 25).  On June 5, 2019, Judge Roberts held a hearing on the motion.  (Doc. 38).  On June 11, 2019, the government moved to strike defendant's motion as untimely.  (Doc. 39).  On June 12, 2019, defendant filed a timely resistance.  (Doc. 41).  On June 12, 2019, Judge Roberts entered an Order alerting the government that he intended to treat defendant's resistance as a motion for leave to file untimely motions.  (Doc. 42).  On June 17, 2019, the government supplemented its motion to strike.  (Doc. 44).  On June 19, 2019, Judge Roberts denied the government's motion to strike.  (Doc. 45).  On August 23, 2019, defendant supplemented his motion to suppress.  (Doc. 62).  On August 28, 2019, a second hearing was held on defendant's motion to suppress.  (Doc. 67).  On September 18, 2019, the parties both submitted supplemental briefs on the motion to suppress pursuant to Judge Roberts' order.  (Docs. 67, 73, 74, & 76).

On June 4, 2019, defendant filed a Motion to Dismiss.  (Doc. 34).  On June 11, 2019, the government filed a timely resistance and moved to strike defendant's motion. (Docs. 39 & 40).  On June 12, 2019, defendant filed a resistance to the government's motion to strike.  (Doc. 41).  On June 17, 2019, defendant filed a reply to the government's resistance and the government supplemented its motion to strike.  (Docs. 43 & 44).  On June 19, 2019, Judge Roberts denied the government's motion to strike. (Doc. 45).  On August 28, 2019, Judge Roberts held a hearing on the motion to dismiss.

(Doc. 67). On September 18, 2019, defendant supplemented his motion to dismiss and the government supplemented its resistance. (Docs. 75 & 77).

On October 8, 2019, Judge Roberts issued his R&R, recommending that the Court deny defendant's Motion to Suppress and its supplements. (Docs. 18, 20, 62, & 86). Judge Roberts also recommended that the Court deny defendant's Motion to Dismiss. (Docs. 34 & 86). The deadline for filing objections to the R&R was October 15, 2019.[1] (Doc. 86). On October 15, 2019, defendant filed his objections to the R&R. (Doc. 91). For the following reasons, the Court adopts Judge Roberts's R&R with minor factual modifications and **denies** defendant's Motion to Suppress (Docs. 18, 20, & 62) and Motion to Dismiss (Doc. 34).

## II.    STANDARD OF REVIEW

The court reviews the magistrate judge's report and recommendation pursuant to the statutory standards found in 28 U.S.C. § 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

28 U.S.C. § 636(b)(1) (2006); *see* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

---

[1] Under 28 U.S.C. Section 636(b), parties generally have up to 14 days to file objections to a magistrate judge's R&R. This time period, however, is "a maximum, not a minimum. The court may require a response within a shorter period if exigencies of the calendar require[.]" *United States v. Barney*, 568 F.2d 134, 136 (9th Cir. 1978), *cert. denied*, 435 U.S. 955 (1978). In order to maintain the current trial schedule, the Court here required the parties to file their objections to the R&R within 7 days. (Doc. 86, at 56); *see also United States v. Williams*, No. 1:18-CR-150-WKW-SMD, 2019 WL 3334358, at *6 n.2 (M.D. Ala. May 9, 2019) ("Due to the current timing of trial, the undersigned has shortened the usual period for filing objections.").

Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, however, the district court must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate's report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review, of course, is nondeferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) (noting also that "[w]hen de novo review is compelled, no form of appellate deference is acceptable"); *see Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R.Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect 28 U.S.C. § 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of § 636 a district court's required de novo review is limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1); *see Thomas*, 474 U.S. at 154 ("Any party that desires plenary consideration

by the Article III judge of any issue need only ask." (emphasis added)). Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit has concluded that general objections require "full de novo review" if the record is concise. *Id.* ("Therefore, even had petitioner's objections lacked specificity, a de novo review would still have been appropriate given such a concise record."). Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996) ("The court finds that the distinction between a flawed effort to bring objections to the district court's attention and no effort to make such objections is appropriate.").

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996) (noting when no objections are filed and the time for filing objections has expired, "[the district court judge] would only have to review the findings of the magistrate judge for clear error"); *Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to FED. R. CIV. P. 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly

erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007) (noting a finding is not clearly erroneous even if another view is supported by the evidence), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *U.S. Gypsum Co.*, 333 U.S. at 395.

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* Fed. R. Civ. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court

always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

## III. DEFENDANT'S MOTION TO SUPPRESS

### A. Factual Background

After reviewing the record, the Court finds that, except when noted, Judge Roberts accurately and thoroughly set forth the relevant facts in his R&R. (Doc. 86, at 4-14). Defendant raises two objections to Judge Roberts' factual findings (Doc. 91, at 3-5), each of which the Court notes and discusses below.

> This case involves an alleged conspiracy to distribute methamphetamine and cocaine in the Northern District of Iowa. The investigation into this alleged conspiracy included law enforcement use of GPS tracking devices on two vehicles and a surveillance camera to monitor a Dubuque, Iowa residence. In addition to this surveillance activity, the investigation also included searches of Defendant's person, Defendant's hotel room, one of the vehicles that was subject to tracking, a storage unit, and a residence that was subject to surveillance. All searches were conducted pursuant to warrants issued by Iowa state court judges. Defendant seeks to suppress all physical evidence seized during these searches, and seeks dismissal of the case. (Docs. 18, 20, 34, 62.)

> ### A. Search Conducted Via GPS Mobile Tracking Devices Affixed to Two Vehicles Beginning December 5 and 6, 2018
> Law enforcement first learned of Defendant's alleged involvement in a drug trafficking conspiracy between late 2017 and early 2018. (Gov. Ex. 1 at 3-4 ¶ 4.) In April 2018, Investigator Chad Leitzen of the Dubuque Drug Task Force ("DDTF") met with M.S., one of Defendant's alleged customers. (*Id*. at 4 ¶ 9.) M.S. told Investigator Leitzen that Defendant is a large methamphetamine dealer in Dubuque. (*Id*. at 3-4 ¶ 4.) M.S. further told Investigator Leitzen that Defendant regularly makes trips to Kansas City to pick up large amounts of methamphetamine, then sells that

methamphetamine in Dubuque. (*Id.* at 4 ¶ 5.) M.S. stated that K.R.S. is M.S.'s ex-girlfriend, and K.R.S. began dating Defendant after M.S. and K.R.S. ended their relationship. (*Id.* at 4 ¶ 6.) M.S. stated that he had K.R.S.'s phone in his possession, and K.R.S.'s Google Maps history showed she had taken a trip to Kansas City. (*Id.* at 4 ¶ 7.) Shortly after meeting M.S., Investigator Leitzen met K.R.S. at the Dubuque County Jail. K.R.S. told Investigator Leitzen that she once accompanied Defendant to Kansas City. (Kearney June 5, 2019 Hr'g Test; Gov. Ex. 1 at 4 ¶ 8.) K.R.S. told Investigator Leitzen she believed she was going to visit Defendant's family in Kansas City, but the pair instead met a methamphetamine supplier in a hotel. (Gov. Ex. 1 at 4 ¶ 8.) K.R.S. further stated she returned with Defendant to Dubuque so Defendant could sell the methamphetamine. (*Id.* at 4 ¶ 8.).

On May 26, 2018, the Muscatine County Sheriff's Office investigated a motor vehicle accident in the city of Muscatine, Iowa. (*Id.* at 4 ¶ 10.) The debris from the accident included two backpacks holding a total of 8.5 ounces of methamphetamine. (*Id.*) Defendant's name was present on items found in the backpacks.[2] (*Id.*; Def. Ex. G.)

On October 10, 2018, Deputy Daniel Kearney [("Deputy Kearney")] met with Dubuque County Jail inmate C.M. (Gov. Ex. 1 at 5 ¶ 17.) C.M. told Deputy Kearney that Defendant regularly brings five to ten kilograms of methamphetamine into the Dubuque area, but C.M. did not provide any specific dates regarding when Defendant allegedly brought the methamphetamine to Dubuque. (*Id.*; Kearney June Hr'g Test.) In a second meeting with Deputy Kearney on November 6, 2018, C.M. stated that Defendant was residing at K.H.'s Dubuque residence and that the residence is Defendant's safehouse. (Gov. Ex. 1 at 6 ¶ 26; Gov. Ex. 3 at 12 ¶ 15.) Law enforcement believed K.H. resided at 740 Boyer Street. (Gov. Ex. 1 at 6 ¶¶ 25-26.)

On October 16, 2018, Investigator Leitzen spoke with D.G.F. while D.G.F. was in custody for possession of ice methamphetamine. (*Id.* at 4 ¶ 11.) D.G.F. told Investigator Leitzen that Defendant was the largest methamphetamine dealer in Dubuque. (*Id.* at 5 ¶ 12.) D.G.F. repeated M.S.'s claim that Defendant picks up methamphetamine every week or two from a supplier in Kansas City, and returns to Dubuque to sell the methamphetamine. (*Id.* at 5 ¶ 15.) D.G.F. further stated that Defendant

---

[2] The Court agrees with Judge Roberts and declines to consider the backpack or its contents as evidence supporting probable cause. (Doc. 89, at 5 n.1).

drove a silver minivan or silver car, and that Defendant texted D.G.F. coded drug messages. (*Id.* at 5 ¶¶ 12, 14.) D.G.F. has a criminal history, but, as was true of all individuals law enforcement interviewed, the affidavit did not include information about D.G.F.'s motivation for providing information or a promise of leniency. At the hearing, Deputy Kearney testified no such promises were made. (Kearney June Hr'g Test.)

Investigator Leitzen's October 16 conversation with D.G.F. also sparked law interest in the vehicles law enforcement would eventually track because D.G.F. stated Defendant drove a silver car or silver minivan. (Gov. Ex. 1 at 5 ¶ 12.)

On October 26, 2018, investigators observed a silver Cadillac with license plate HLE 743 ("the silver Cadillac") parked at 740 Boyer Street, where law enforcement believed Defendant resided with K.H. (*Id.* at 5 ¶ 19.) The silver Cadillac was registered to James Alan Kringle of Dubuque, Iowa. (*Id.*) In addition to the silver Cadillac, investigators also observed a silver Chrysler Town and Country minivan with Iowa license plate GZL 536 ("the silver van") and a silver Chevrolet Monte Carlo ("the silver Chevrolet") parked at 740 Boyer Street. (*Id.*) Both the silver van and the silver Chevrolet were registered to Defendant. (*Id.*) Investigators observed the silver Cadillac and the silver van parked at 740 Boyer Street on multiple other occasions. (*Id.*)

On October 29, 2018, Deputy Kearney met with Confidential Informant ("C.I.") #12117. (*Id.* at 5 ¶ 18.) C.I. #12117 stated K.H.'s methamphetamine supplier drove a silver van and further identified Defendant in a photo lineup as K.H.'s methamphetamine supplier. (*Id.*).

On October 30, 2018, DDTF investigators observed Defendant leave the Q Casino in Dubuque in the silver Cadillac. (*Id.* at 6 ¶ 25; Kearney June Hr'g Test.) The silver Cadillac was then driven to 740 Boyer Street. (Gov. Ex. 1 at 6 ¶ 25; Kearney June Hr'g Test.) The record does not identify who drove the silver Cadillac.

On November 19, 2018, investigators met with Dubuque County Jail inmate R.H. (Gov. Ex. 1 at 7 ¶ 27.) R.H. identified Defendant as the main methamphetamine supplier in Dubuque. (*Id.*) R.H. further stated that Defendant drove a light-colored Cadillac and a silver van. (*Id.*)

On November 30, 2018, the DDTF began conducting twenty-four-hour video surveillance on 740 Boyer Street using a Milestone surveillance camera. (Kearney Aug. 28, 2019 Hr'g Test.) This Milestone camera remained in place until mid-January 2019. (Kearney Aug. Hr'g Test.) During the course of this surveillance, Deputy Kearney printed

approximately six or seven screenshots of relevant surveillance footage. (Kearney Aug. Hr'g Test.)

On November 30, 2018, Deputy Kearney applied for a GPS mobile tracking device search warrant for the silver Cadillac and the silver van. (Gov. Ex. 1 at 1-2.) Deputy Kearney signed an affidavit in support of the application. (*Id.* at 8.) November 30, 2018, the application was subscribed and sworn to a judge, who issued the warrant. (*Id.* at 2, 9.)

On December 5, 2018, the DDTF, with the Bettendorf Police Department's assistance, placed a GPS mobile tracking device on the silver Cadillac. (Gov. Ex. 3 at 13 ¶ 18.) On December 6, 2018, the DDTF placed a GPS tracking unit on the silver van. (*Id.*)

### B. December 30, 2018 Search of the Storage Unit at Alt's Mini Storage in Dubuque, Iowa

Although the record does not provide exact dates, investigators observed Defendant frequently visit Alt's Mini Storage unit 388 ("unit 388") prior to December 30, 2018. (Def. Ex. K at 3; Gov. Ex. 2 at 7 ¶ 18.) Additionally, the GPS unit discussed above showed the silver van visited unit 388. (Def. Ex. K at 3; Gov. Ex. 2 at 7 ¶ 18.)

On November 16, 2018, the DDTF conducted open-air dog sniffs at Alt's Mini Storage. (Gov. Ex. 2 at 7 ¶ 18.) Deputy Kearney's canine partner Odim indicated on unit 388. (*Id.*) Unit 388 was registered to K.H., to whom law enforcement believed Defendant was supplying methamphetamine. (Gov. Ex. 1 at 5 ¶ 18; Gov. Ex. 2 at 7 ¶ 18.) The Dubuque County Sheriff's K-9 Unit subsequently performed two additional open-air sniffs, with canines indicating on unit 388 each time. (Gov. Ex. 2 at 8 ¶ 19.)

Deputy Dan Kearney has been employed as a Dubuque County Sheriff's Deputy since May 2003. (Gov. Ex. 1 at 3 ¶ 1.) He became a canine handler in 2009 (*Id.*) and was promoted to drug task force investigator in 2017. (Kearney August Hr'g Test.) Deputy Kearney has worked with Odim since 2014. (*Id.*) Odim is Deputy Kearney's second dog as a canine handler. (*Id.*)

On December 30, 2018, Investigators Leitzen and Schlosser executed a search warrant on unit 388. (Def. Ex. K. at 3.) Investigator Nick Schlosser applied for the search warrant on December 28, 2018. (Gov. Ex. 3 at 3.) Judge Scott Engleman signed the application on December 28, 2018 and issued the search warrant. (*Id.* at 3, 25.) The

search of the storage unit yielded two handguns and ammunition. (Def. Ex. K at 4.)

### C.    *December 30, 2018 Search of the Silver Cadillac*

October 13, 2018 surveillance footage from Rhythm City Casino showed Defendant enter the casino with E.D. and an unidentified white man. (Gov. Ex. 3 at 10-11 ¶ 13.)  The video later shows the unidentified man place cash near the slot machine where E.D. was seated. (*Id.*)

(Doc. 86, at 4-9) (footnotes omitted).

In his R&R, Judge Roberts found that "E.D. then removed a bag with a white substance from her purse" and handed it to the unidentified white man. (Doc. 86, at 9). Judge Roberts cites the search warrant application to support his finding. (*Id.*) (citing Doc. 27-2, at 10-11).  The application states that "Special Agent Mulnix and Investigator Slight reviewed surveillance video" provided by Rhythm City Casino, which shows E.D. reach into her purse and hand the unidentified white man "a bag containing a white colored substance." (Doc. 27-2, at 10-11).  Defendant objects to this finding, noting that the police report composed by Special Agent Mulnix states that the object passed from E.D. to the unidentified white man "could not be identified." (Doc. 91, at 3) (citing Docs. 89, at 13, 30-3).  In his testimony, Deputy Kearney acknowledged that the police report did not identify the object passed between E.D. and the unidentified white man. (Doc. 89, at 13).  Deputy Kearney stated, however, that he believed the application's mention of a white substance was based on "Investigator Slight's knowledge." (*Id.*).  The warrant application appears to indicate that Special Agent Mulnix and Investigator Slight viewed the same surveillance footage of the casino. (Doc. 27-2, at 10-11).  The positioning and clarity of the surveillance footage suggest it is possible that the object could be identified by a viewer of the footage. (Doc. 30-3).  There are no facts in the record, however, to support the assertion that Investigator Slight was able to identify the object passed while Special Agent Mulnix could not.  The Court, therefore, will consider

this interaction merely as some transaction between E.D. and the unidentified white man and deem the object as currently unidentified.[3]

The surveillance footage then shows Defendant, E.D., and the man in a silver Cadillac with a temporary rear plate. (*Id.*) The surveillance footage then shows Defendant driving the Cadillac away from the casino. (*Id.*)

As discussed above, the DDTF obtained a warrant on November 30, 2018, authorizing law enforcement to track the silver Cadillac using a GPS mobile unit. (*Id.* at 13 ¶ 18.) This tracking unit allowed law enforcement to follow the vehicle's movement. The vehicle traveled routes law enforcement believed to be consistent with an individual conducting countersurveillance. (*Id.* at 16 ¶ 22.) The DDTF also observed Defendant traveling to and from 740 Boyer Street in the silver Cadillac, and observed Defendant removing duffel bags from the silver Cadillac while the car was parked at 740 Boyer Street. (*Id.* at 13-14 ¶¶ 19–20.)

On December 28, 2018, Officer Nicholas G. Schlosser of the Dubuque Police Department applied for a search warrant authorizing a search of the silver Cadillac. (*Id.* at 4.) The affidavit accompanying the December 28 search warrant application states that Officer Schlosser currently works in the Dubuque Police Department's Criminal Investigations Division. (*Id.* at 4 ¶ 1.) Additionally, Officer Schlosser is a Task Force Officer for the Bureau of Alcohol, Tobacco, Firearms, and Explosives. (*Id.*)

Officer Schlosser's affidavit supporting the December 28 application was partly based on surveillance law enforcement conducted at the Q Casino in Dubuque. DDTF investigators observed the silver Cadillac parked at the Q Casino, observed Defendant in the casino, and observed Defendant leave the casino in the silver Cadillac. (*Id.* at 11-12 ¶ 14.)

Pursuant to the same warrant authorizing the search of unit 388, the DDTF conducted a search of the silver Cadillac while it was parked outside the Hilton Garden Inn in Dubuque, Iowa on December 30, 2018. (Def. Ex. K at 3.) The search yielded Ziploc bags, gem baggies, a bag of rubber bands, glass methamphetamine smoking pipes, and a pill bottle containing

---

[3] In his R&R, Judge Roberts later characterizes this interaction as a "drug transaction." (Doc. 89, at 24). In light of the Court's above factual modification, the Court finds this interaction was transactional but that the object of the transaction was not identified.

an off-white crystal substance. (*Id.*) This off-white crystal substance field-tested positive for methamphetamine. (*Id.*)

### D. December 30, 2018 Search of Room 242 in the Hilton Garden Inn, Dubuque, Iowa

On December 30, 2018, the DDTF conducted a search of room 242 at the Hilton Garden Inn in Dubuque, Iowa. (Doc. 25-1 at 6.) The search warrant was based, in part, on an open-air sniff Dubuque Police Officer Mathew Sitzman[4] and his canine partner Mali conducted in the hallway outside room 242 at approximately 12:41 a.m. (Gov. Ex. 2 at 11 ¶ 40.) Inside room 242, Investigators found a white substance that field tested positive for cocaine, a small gem bag with ice methamphetamine, glass smoking pipes, assorted unidentified pills, cell phones, laptops, stealth cameras, a trail camera, notebooks containing possible drug ledgers, and a pill bottle with an unidentified brown crystal substance. (Def. Ex. K at 4.)

While many circumstances led to the search of room 242, a crucial factor was Mali's indication on room 242. (Gov. Ex. 2 at 11 ¶ 40; Def. Ex. K at 3.) Defense counsel and the Government stipulated that Mali was properly certified and participated in continual training. (Sitzman June 5, 2019 Hr'g Test.)

In addition to the open-air sniff and information from sources discussed above, the warrant application for room 242 was based in part on information from the GPS trackers on the silver Cadillac and the silver van. (Gov. Ex. 2 at 8, 9-10 ¶¶ 22-23, 31-33.) The application was also based on the video surveillance of 740 Boyer Street. (*Id.* at 8-10 ¶¶ 24-25, 29, 34.) Video footage of that surveillance is not available because it was not saved on any servers. (Kearney August Hr'g Test.) The warrant application was also based on the open-air sniffs of unit 388. (Gov. Ex. 2 at 7 ¶ 18.)

At approximately 6:30 p.m. on December 29, 2018, Deputy Kearney set up surveillance at the Hilton Garden Inn in Dubuque, Iowa, a place Defendant was known to frequent. (Def. Ex. K at 1.) Deputy Kearney simultaneously surveilled 740 Boyer Street via a video feed from the Milestone camera. Using this video feed, Deputy Kearney observed E.D., Defendant, and an unknown woman enter the silver Cadillac. (*Id.* at 1-2.) Law enforcement was no longer able to track the silver Cadillac with a GPS

---

[4] The Court notes that Dubuque Police Officer Matthew Sitzmann's ("Deputy Sitzmann") name is misspelled throughout the R&R.

unit because someone had removed the unit on December 23, 2018. (*Id.* at 1.) Investigator Williams, an investigator with the DDTF, joined Deputy Kearney at the Hilton Garden Inn at approximately 9:30 p.m. (*Id.* at 1.) At approximately 10:15 p.m., Investigator Williams and Deputy Kearney observed what they believed to be the silver Cadillac arrive at the Hilton Garden Inn. (*Id.* at 2.) Shortly after 10:15 p.m., Investigator Nick Schlosser found the silver Cadillac parked near the rear hotel parking lot, but the vehicle was unoccupied. (*Id.*)

After identifying the silver Cadillac parked near the rear hotel parking lot, Investigator Schlosser went into the casino's surveillance room to locate Defendant. (*Id.*) Investigator Schlosser reviewed casino surveillance footage, which showed E.D. and Defendant enter the rear hotel entrance. (*Id.*) Investigator Schlosser also saw E.D. and Defendant enter room 242. (*Id.* at 2-3.) At approximately 12:10 a.m. on December 30, E.D. exited room 242 to smoke a cigarette with the hotel desk clerk. (*Id.* at 3.) Deputy Kearney detained E.D. and led her into a private conference room. (*Id.*) E.D. consented to searches of her person and her purse that did not yield any illegal contraband. (*Id.*)

At approximately 12:13 a.m. on December 30, Special Agent Joshua Mulnix of the Division of Narcotics Enforcement (Gov. Ex. 2 at 6 ¶ 12), Investigator Leitzen, and Sergeant Gary Pape of the DDTF detained Defendant at the bottom of a staircase between room 242 and an exit from the hotel. (Def. Ex. K at 3; Kearney Aug. Hr'g Test.) Defendant was moved to a room separate from E.D. (Def. Ex. K at 3.) Defendant had $10,000 in his possession when he was detained. (*Id.*)

At approximately the same time Special Agent Mulnix, Investigator Leitzen, and Sergeant Pape detained Defendant and E.D., Mali performed the open-air dog sniff of the hallway outside of room 242 with Deputy Sitzman. (*Id.*) Deputy Sitzman has been a deputy since 2007, and has been a canine handler since 2015. (Sitzman Hr'g Test.)

Deputy Sitzman and Mali conducted an open-air sniff on several doors in the hallway outside room 242. (Def. Ex. A.) The open-air sniff begins as Mali, on a leash, enters opposite the camera. (*Id.* at 0:10.) Deputy Sitzman begins by making small circles with Mali near the end of the hallway. (*Id.* at 0:15.) Deputy Sitzman and Mali move down the hallway past the doors, commencing with those on the right side of the hallway (from the viewer's perspective) and moving to the doors on the left. (*Id.* at 0:20.) Mali passes the doors quickly. Then Deputy Sitzman points toward the bottom of the doors, apparently seeking a closer

14

inspection.  (*Id.* at 0:20.)  When Mali returns to a door, he spends a few seconds with his nose near the floor, and then moves on to other doors. (*Id.* at 0:20.)

Mali, still leashed, shows heightened interest for the first time when he passes by room 242, on the left side of the hall.  (*Id.* at 1:00.)  Deputy Sitzman seems to point at the bottom of the door several times, but a wall obstructs the view of his arm and head, so it is difficult to see exactly where he is pointing.  (*Id.* at 1:00.)

(Doc. 86, at 9-13) (footnotes omitted).

The Court, in light of defendant's objection (Doc. 91, at 3-4), supplements Judge Roberts' factual findings here.[5]  Deputy Sitzmann swept room 242 with Mali three times but only swept the other doors in the hall one time each.  (Doc. 60, at 27-29).  Deputy Sitzmann also gestured toward the bottom of the door to room 242 with his arm several times, although these gestures are partially obscured by the wall.  (*Id.*).  Deputy Sitzmann testified that these additional sweeps were necessary because Mali had "cut the corner' on room 242 by not fully sniffing at the door seam.  (*Id.*).

Mali then lies on his stomach in front of room 242.  (*Id.* at 1:11.)  Deputy Sitzman then tugs on the leash, pulling towards the camera.  (*Id.* at 1:13.)  Mali remains down.  (*Id.* at 1:13.)  Deputy Sitzman then tugs again on the leash, this time in the opposite direction.  (*Id.* at 1:17.)  Mali remains down. (*Id.* at 1:17.)  Deputy Sitzman then drops the leash and walks toward the camera.  (*Id.* at 1:18.)  Mali remains down in front of room 242.  (*Id.* at 1:18.)  Deputy Sitzman stops, turns, and faces Mali, who remains down. Deputy Sitzman does not appear to say anything to Mali.  (*Id.* at 1:25.) Deputy Sitzman then starts to walk back towards Mali, who remains down in front of room 242.  (*Id.* at 1:31.)

As Deputy Sitzman walks past Mali, Mali remains down in front of room 242 and Deputy Sitzman tosses a ball behind his back, bouncing it against the door or the wall.  (*Id.* at 1:35.)  Mali chases the ball, grabs it in his mouth, and runs to Deputy Sitzman, who is now standing in

[5] The Court notes that defendant erroneously cites the transcript from August 28, 2019.  (Doc. 91, at 3-4) (citing Doc. 89, at 27-29, 40).  Deputy Sitzmann's testimony is contained in the transcript from June 5, 2019.  (Doc. 60, at 13-40).

approximately the middle of the hallway. (*Id.* at 1:39.) Mali turns and runs to the other officers. (*Id.* at 1:40.) Mali runs past a utility room on the right side of the screen to get to the other officers and appears momentarily distracted there. (*Id.* at 1:42.)

Deputy Sitzman walks towards the other officers and Mali. (*Id.* at 1:45.) When Deputy Sitzman reaches Mali, he pets Mali directly outside of the utility room. (*Id.* at 1:45.) Deputy Sitzman then appears to send Mali in the direction of the camera such that he momentarily disappears. (*Id.* at 1:50.) When Mali returns, Deputy Sitzman gives him a "down" command in the hallway outside of the utility room. (*Id.* at 1:55.) Deputy Sitzman leads Mali out of view. (*Id.* at 2:05.)

When Mali returns, he runs to the utility room and sniffs the bottom of the door. (*Id.* at 2:53.) Mali briefly turns towards Deputy Sitzman, but as Deputy Sitzman walks past Mali towards the opposite end of the hallway, Mali does not follow him. (*Id.* at 2:55-2:58.) Instead, Mali turns back toward the utility room and smells the bottom of the door again. (*Id.* at 2:58.) Mali then lies down on his stomach in front of the utility room. (*Id.* at 3:02.) Officers appear to be conversing near Mali, but Mali remains down. (*Id.* at 3:02.) Deputy Sitzman, standing a few feet from Mali, tosses a ball at him. (*Id.* at 3:06.) Mali chases the ball, and returns to Deputy Sitzman and is petted. (*Id.* at 3:08.)

Mali alerts to the presence of narcotics by lying down. (Sitzman Hr'g Test.) Deputy Sitzman rewards Mali for alerting to narcotics in several ways, one of which is throwing a ball for Mali. (*Id.*)

### E. December 30, 2018 Search of 740 Boyer Street

On December 30, 2018, the DDTF executed a search warrant on 740 Boyer Street. (Def. Ex. K at 4-5.) This search was conducted pursuant to the same search warrant authorizing the searches of unit 388 discussed in Section II.B. and the silver Cadillac discussed in Section II.C. (Gov. Ex. 3 at 1.)

Investigator Leitzen and Deputy Kearney left the Hilton Garden Inn at 4:35 a.m. to assist investigators conducting the search of 740 Boyer Street. (Def. Ex. K at 4.) Other DDTF investigators were already searching the residence's basement when Investigator Leitzen and Deputy Kearney arrived. (*Id.* at 5.) It is unclear what time investigators began searching the residence. Law enforcement focused the search on the basement because this is the area where law enforcement believed Defendant resided. (*Id.*) The search of 740 Boyer Street concluded at 6:30

a.m. on December 30, 2018 and yielded packaging material, digital scales, surveillance cameras, cell phones, and the GPS tracking unit law enforcement had installed on the silver Cadillac. (*Id.*)

(Doc. 86, at 13-14) (footnotes omitted).

### B.  Analysis

Regarding his Motion to Suppress (Docs. 18, 20, & 62), defendant objects to Judge Roberts' R&R on two grounds. (Doc. 91, at 5-13). First, defendant asserts that the warrant allowing GPS tracking of his silver Cadillac and silver van ("GPS warrant") lacked probable cause because it was based on stale information. (*Id.*, at 5-12). Second, defendant argues the warrant to search room 242 ("hotel warrant") also lacked probable cause because it was based on an improperly conducted canine sniff. (*Id.*, at 12-13). The Court will address each warrant in turn.

### 1.  GPS Warrant

Defendant asserts the GPS warrant lacked probable cause because it was primarily based on stale and vague information from unreliable informants. (Doc. 91, at 5-11). Defendant asserts that the information did not reveal how, where, and when any alleged distributions occurred nor how the informant knew about them. (*Id.*, at 6). Defendant alleges that law enforcement's stale information was not corroborated by more recent information, thus distinguishing this case from *United States v. Petruk*. (*Id.*, at 7-9).

"In reviewing the issuance of a warrant, a district court need not make a de novo inquiry into the existence of probable cause, but rather should uphold the decision to issue the warrant so long as it is supported by 'substantial evidence in the record.'" *United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) (citing *Massachusetts v. Upton*, 466 U.S. 727, 728 (1984)). "Probable cause has been shown if the warrant application and affidavit describe circumstances showing 'a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v.*

*Robinson*, 536 F.3d 874, 877 (8th Cir. 2008) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231).

In his R&R, Judge Roberts exhaustively lists all the investigative work outlined in the application for the GPS warrant. (Doc. 86, at 18-20) (citing Doc. 27). The Court finds this summary to be an accurate reflection of the application and incorporates it here:

> As part of this investigative effort, officers conducted face-to-face meetings with multiple informants (Gov. Ex. 1 at 3-5, 7 ¶¶ 4-9, 17, 27) and spoke with other informants. (*Id.* at 4 ¶¶ 9-11.) Many of these informants corroborated each other's statements. For example, multiple informants interviewed between April and November 2018 stated Defendant was a large-scale methamphetamine distributor in the Dubuque market. In interviews and meetings conducted between April and November 2018, M.S., D.G.F., and R.H. all told investigators that Defendant was one of the largest methamphetamine suppliers in Dubuque. (*Id.* at 4-5,7 ¶¶ 9, 12, 27.) Furthermore, both M.S. and D.G.F. stated Defendant made frequent trips to Kansas City to purchase methamphetamine for distribution in Dubuque. (*Id.* at 3-5 ¶¶ 4-5, 15.) M.S. told Investigator Leitzen that K.S accompanied Defendant on a trip to Kansas City, during which Defendant purchased methamphetamine from a supplier. (*Id.* at 4 ¶ 6.) K.R.S. corroborated M.S.'s claim and confirmed with Investigator Leitzen that K.R.S. accompanied Defendant to Kansas City, and that Defendant purchased methamphetamine from a supplier during that trip. (*Id.* at 4 ¶ 8.) Informants also corroborated that Defendant drove a silver car or silver van. (*Id.* at 5, 7 ¶¶ 12, 17-18, 27.) During an October 10, 2018 meeting with Deputy Kearney, C.M. stated Defendant drove a silver car or silver van. (*Id.* at 5 ¶ 17.) During an October 16, 2018 meeting with Investigator Leitzen, D.G.F. also stated Defendant drove either a silver car or silver van. (*Id.* at 5 ¶ 12.) On October 29, 2018, C.I. #12117 also stated Defendant drove a silver van. (*Id.* at 5 ¶ 18.) On November 19, 2018, R.H. told investigators that Defendant drove a silver van and a light-colored Cadillac. (*Id.* at 7 ¶ 27.)

Investigators' independent observations also led them to the silver van and the silver Cadillac. On or about October 19, 2018, investigators observed the silver van parked along with the silver Cadillac at 740 Boyer Street on multiple occasions. (*Id.* at 5 ¶ 19.) The silver van was registered to Defendant. (*Id.*) Additionally, investigators observed Defendant use the silver Cadillac to travel from the Q Casino to 740 Boyer Street, where investigators observed the silver Cadillac parked with the silver van on multiple occasions. (*Id.* at 5-6 ¶¶ 19, 25.)

(*Id.*, at 19-20).

Although some of the information lacked detail, the volume and corroboration of the information constitutes substantial evidence in support of probable causes here. *See Robinson*, 536 F.3d at 877. The level of specificity demanded by defendant is not necessary. *See Colbert*, 605 F.3d at 576. Law enforcement officers obtained information from multiple sources who corroborated key aspects of defendant's alleged criminal activity over the span of months. These sources described an ongoing scheme in which defendant would frequently use his silver Cadillac or silver van to transport drugs from Kansas City to Dubuque. As noted in *Petruk*, "[w]here the crime under investigation is 'of a continuous nature,' the passage of time between the last described act and the application for a warrant is less significant." 929 F.3d at 960. *Petruk* cites *United States v. Day* in holding that "information about criminal activity at an earlier, unspecified time may combine with factually connected, recent, time-specific information to provide a substantial basis for the conclusion that the criminal activity described in an affidavit is sufficiently close in time to the search warrant application." *Id.* (quoting *United States v. Day*, 949 F.2d 973, 978 (8th Cir. 1991)). Here, multiple sources alleged that defendant was using a silver vehicle in an ongoing drug trafficking scheme. (Doc. 27). That vehicle was observed at 740 Boyer Street as described by sources. (*Id.*, at 5). Defendant was observed in his silver Cadillac at the Q Casino on October 30, 2018. (*Id.*, at 6). On October 13, 2018, surveillance video showed defendant was involved in

suspicious transactions at another casino and driving a silver Cadillac that appeared to have a temporary rear plate. (*Id.*). These facts connect past criminal conduct with more recent conduct sufficient to create a reasonable inference that the criminal activity was ongoing. *See Petruk*, 929 F.3d at 960.

Although the facts here are distinguishable from *Petruk*, there is no "fixed formula" for evaluating the freshness of information. *See id.*, at 960. Instead, courts consider the nature of the crime and the property being searched. *Id.* Importantly, when an affidavit indicates the "presence of an ongoing, continuous criminal enterprise," the Eighth Circuit has been less critical of time gaps between the criminal conduct and warrant application. *See, e.g.*, *United States v. Rugh*, 968 F.2d 7750, 754 (8th Cir. 1992) (holding that sixteen-month-old information involving the distribution of child pornography by a continuous criminal enterprise was not stale). Considering the allegedly ongoing nature of the criminal enterprise here as well as the time needed to interview and develop information, the lapse of time between the conduct and application does not cause the information to be stale. Therefore, the Court finds substantial evidence was present to support a finding that the warrant application established probable cause to surveil defendant's vehicles.

Even if the GPS warrant lacked probable cause, the good faith exception from *United States v. Leon* would apply here. *See* 468 U.S. 897, 922 (1984). There is no evidence that the warrant application contained a false statement or that the magistrate judge abandoned his judicial duties in approving it. *See United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). Moreover, even if a magistrate judge were concerned about the freshness of the information, the warrant application is not "so facially deficient" that approval is "entirely unreasonable." *See id.*; *see also United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (approving a warrant based on four-month-old information); *Rugh*, 968 F.2d at 754 (approving a warrant based on sixteen-month-old information).

Nor was the warrant "so facially deficient" that no officer could reasonably rely on it. *See id.* The wealth of investigatory work included in the application precludes these exceptions to the *Leon* rule. (Doc. 27). Regardless of the presence of probable cause, law enforcement acted reasonably in relying on the magistrate judge's issuance of the GPS warrant.

Because the GPS warrant was supported by probable cause, information obtained as a result of the GPS warrant need not be excluded from subsequent warrants. Therefore, the warrants are not fruit of the poisonous tree and need not be suppressed. *See, e.g.*, *United States v. Smith*, 715 F.3d 1110, 1118 n.5 (8th Cir. 2013).

For these reasons, the Court adopts Judge Roberts' R&R with minor factual modifications on this issue and defendant's Motion to Suppress is **denied** as to the GPS warrant.

### 2. Hotel Warrant

Defendant asserts the hotel warrant also lacks probable cause because it was primarily based on an improperly conducted canine sniff. (Doc. 91, at 12-13). Specifically, defendant alleges that Deputy Sitzmann cued Mali to alert on room 242 by sweeping Mali past the door three times but only sweeping the other doors once. (*Id.*). Defendant also argues that the omission of this fact from Deputy Sitzmann's affidavit was a material omission which invalidates the warrant. (*Id.*, at 13).

A court can presume that a certified canine's alert provides probable cause to search. *Florida v. Harris*, 568 U.S. 237, 246-47 (2013). "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Id.*, at 248. If a police officer cues the canine to alert, whether consciously or unconsciously, probable cause may be undermined. *Id.*, at 247. The relevant question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would

reveal contraband or evidence of a crime." *Id.*, at 248. For example, in *United States v. Tuton*, the canine sniffed every bag in a luggage compartment instead of only sniffing one suspicious suitcase, thus boosting the reliability of his alert. 893 F.3d 562, 567 (8th Cir. 2018). In contrast, a handler's knowledge of a specific target can indicate unconscious cuing. *See, e.g.*, *United States v. Hunsberger*, No. 2:14-cr-00328-KJD-NJK, 2015 WL 7068727, at *17 (D. Nev. Aug. 26, 2015) (noting in the inverse that a handler's lack of knowledge of a target boosts the reliability of a canine's alert).

Here, the facts do not outweigh the presumption that Mali, as a properly certified and trained drug dog, is a reliable source. *See Harris*, 568 U.S. at 246-47. Mali's alert, even in the absence of the other evidence cited in the affidavit, is sufficient to generate probable cause. *See id.* Deputy Sitzmann swept Mali by every door on the hall, not just room 242, thus boosting the reliability of Mali's alert. *See Tuton*, 893 F.3d at 567. On the other hand, Deputy Sitzmann was aware of the targeted room which could have unconsciously influenced his decision to bring Mali back to room 242 for two more sniffs. *See Hunsberger*, 2015 WL 7068727, at *17. Deputy Sitzmann testified, however, that bringing Mali back to the door was a conscious decision because Mali "cut the corner" and did not fully sniff the seam of the door. (Doc. 60, at 27-29). Even if the Court were to disregard this explanation and assume Deputy Sitzmann swept Mali past room 242 because of his subconscious knowledge of the target, these facts alone would not outweigh Mali's positive alert on room 242 and only room 242. On balance, the Court finds that the canine sniff here was conducted properly. Moreover, because Mali's sniffing of the door three times was due to cutting corners, the Court finds that the omission of this information from the affidavit was not a material omission.

For these reasons, the Court adopts Judge Roberts' R&R with minor factual modifications on this issue and defendant's Motion to Suppress is **denied** as to the hotel warrant.

## IV.    DEFENDANT'S MOTION TO DISMISS

### A.    Factual Background

As above, the Court adopts Judge Roberts' factual findings except where otherwise noted.

> Deputy Kearny and DNE Agent Josh Mulnix set up a "Milestone Camera" in the residence across from 740 Boyer street on November 30, 2018 to conduct surveillance.  Defendant's Exhibit 1 to his motion to dismiss is Deputy Kearney's Supplementary Report.  It is undated, but appears to have been drafted after the third week of January, 2019 when the camera was removed.  The camera did not save video the way the he thought it would.  Although the City of Dubuque has many traffic cameras stationed around Dubuque, it only has two moveable cameras dedicated to police surveillance. (Kearny Aug. Hr'g Test.)  Both cameras were already in use when officers wanted to conduct surveillance of 740 Boyer.  (*Id.*)  Because of a shortage of cameras, investigators in this case had to use a State of Iowa camera to conduct surveillance.  (*Id.*)  City of Dubuque cameras save footage for 30 days. (*Id.*).  This is how long Deputy Kearny and other officers assumed the state camera would also save video footage. (*Id.*)

(Doc. 86, at 50-51).

Defendant objects, asserting that Deputy Kearney "did not testify to making any 'assumption'" that the State camera did not save footage for thirty days, instead merely stating that he was not aware whether the camera saved footage or not.  (Doc. 91, at 4-5) (citing Doc. 89, at 19.)  Defendant asserts that Deputy Kearney never considered whether the video was being preserved and made no effort to preserve it.  (*Id.*).  At the hearing, Deputy Kearney was asked if he knew when he installed the camera that it would not preserve footage.  (Doc. 89, at 19).  Deputy Kearney stated "I was not aware of that in the beginning because I was familiar with our Dubuque server, cameras were always saved for 30 days." (*Id.*).  Deputy Kearney's response on its face states he was unaware that the State camera was not preserving footage "because" of his knowledge of the

Dubuque cameras. (*Id.*). This implies that Deputy Kearney assumed that the State cameras, like the Dubuque cameras, would preserve footage for thirty days. On this record, Judge Roberts was correct in characterizing these facts as an assumption. (Doc. 89, at 50).

> The camera ran 24-hours a day and was not simultaneously monitored by a police officer all that time. However, under both systems officers could on a Monday, for example, access footage from the prior weekend. (*Id.*) Eventually, Deputy Kearny became aware that he did not actually know what the camera's "look back" period was. (*Id.*) In other words, he was initially unaware how long after footage was recorded, he could go back and review it.
>
> In mid-December, DDPD became aware that the state did not save footage for 30 days. (*Id.*) At that time, Officer Kearny learned that if he had wanted his footage saved, he should have provided hard drives to the state. (*Id.*) Officer Kearny never provided hard drives to the state. (*Id.*) Surveillance continued at 740 Boyer until mid-January 2019. Throughout the time Officer Kearny was conducting surveillance of 740 Boyer using the Milestone camera, he took screen shots of anything he found "significant."

(*Id.*, at 50-51).

### B. Analysis

Regarding his Motion to Dismiss, defendant objects to Judge Roberts' R&R on constitutional grounds. (Doc. 91, at 13-16). Specifically, defendant argues that dismissal is required because the government's failure to preserve the footage captured by the Milestone Camera was a violation of his Due Process rights under the Fifth Amendment. (*Id.*). Regardless of its intentions, the government has a duty to preserve material, exculpatory evidence that "might be expected to play a significant role in the suspect's defense." *California v. Trombetta*, 467 U.S. 479, 489 (1984). To trigger the government's duty of preservation, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the

defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* "If, however, the evidence in question is only potentially useful, as opposed to clearly exculpatory, then a criminal defendant must prove bad faith on the part of the police to make out a due process violation." *United States v. Houston*, 548 F.3d 1151, 1155 (8th Cir. 2008) (citing *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988)).

First, defendant asserts that the Milestone Camera footage was both material and exculpatory, making the government's intentions irrelevant. (Doc. 91, at 14). Defendant alleges that, had the footage been preserved, he could potentially rebut claims by law enforcement about how many parties were visiting the house at 740 Boyer Street. (*Id.*). Although this footage may be useful in undermining the testimony of law enforcement, defendant has not identified any exculpatory value beyond this possible narrow purpose. At trial, defendant may inquire about the absence of this footage, cross-examine law enforcement about their observations, and highlight alleged contradictions in their testimony, as he has done in his objections here. (*Id.*). In other words, the footage's primary use of undermining law enforcement testimony can be achieved even in its absence. Notably, defendant has not shown that any exculpatory purpose was apparent to law enforcement at the time of recording. *See Trombetta*, 467 U.S. at 489. Furthermore, as Judge Roberts noted, defendant also had a surveillance system outside the house, which "significantly undercuts his argument that he could not obtain comparable evidence by other reasonable means." (Doc. 86, at 53); *see Trombetta*, 467 U.S. at 489. Defendant has not met his burden of proving that this alternative and reasonable available source is insufficient. As a result, the Milestone Camera footage is not material, exculpatory evidence and did not trigger the government's duty to preserve.

Second, defendant asserts that, should the Court find the Milestone Camera footage to be only potentially useful, that the government acted in bad faith. (Doc. 91, at 15-16). Deputy Kearney testified that, like the cameras used in Dubuque, he assumed

that the State cameras would preserve footage for thirty days. (Doc. 89, at 19). Deputy Kearney further testified that, upon discovering that the footage was not being saved, he believed it was no longer possible to preserve prior footage. (*Id.*, at 20). Deputy Kearney also attempted in good faith to preserve important footage via screenshots. (Docs. 40-2, 89, at 19). On this record, the Court concurs with Judge Roberts that the failure to preserve the footage was at best negligent and does not constitute bad faith. *See, e.g.*, *Houston*, 548 F.3d at 1155 (finding that officers' failure to preserve video of a traffic stop was at best negligent and not bad faith). As a result, even assuming it was potentially useful, there is no evidence that the government acted in bad faith in failing to preserve the Milestone Camera footage.

For these reasons, the Court finds no error in Judge Roberts' R&R as to defendant's Motion to Dismiss. The Court adopts without modification the R&R on this issue and defendant's Motion to Dismiss (Doc. 34) is **denied**.

## V.    CONCLUSION

For the reasons set forth above, the Court adopts Judge Roberts' R&R with minor factual modifications. (Doc. 86). Defendant's Motion to Suppress (Docs. 18, 20, & 62) and Motion to Dismiss (Doc. 34) are **denied**.

**IT IS SO ORDERED** this 21st day of October, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa